862 A.2d 477

**David NORVILLE**

v.

**ANNE ARUNDEL COUNTY BOARD OF EDUCATION, et al.**

**No. 00761, Sept. Term, 2003.**

Court of Special Appeals of Maryland.

Dec. 6, 2004.

14

16

David C. Slade, Bowie, for Appellant.

William D. Evans, Jr. (Linda M. Schuett, County Atty., on the brief), Annapolis, for Appellees.

Panel: HOLLANDER, BARBERA, and LAWRENCE F. RODOWSKY (Retired, specially assigned), JJ.

HOLLANDER, Judge.

This case involves a claim of age discrimination in employment, brought under federal and Maryland law. We must determine whether, in a suit initiated by a former employee of a county board of education, the school board is an arm of the State [1] for purposes of sovereign immunity.

David Norville, appellant, was discharged by the Anne Arundel County Board of Education (the "Board") when he was 48 years old. That termination led Norville to file suit in the Circuit Court for Anne Arundel County against the Board and Norville's supervisor, Don Cramer, appellees. In an Amended Complaint, Norville alleged, *inter alia*, age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634 (the "ADEA"), as well as the Fair Employment Practices Act, Md. Code (1957, 2003 Repl. Vol.), Art. 49B, § 16(a). Norville also asserted claims for common law wrongful discharge and intentional infliction of emotional distress. In successive rulings over a period of months, the court dismissed all of Norville's claims prior to trial.

On appeal, Norville poses the following questions: [2]

---

1. When referring to Maryland, we shall capitalize the word "State."

2. Appellant's questions on appeal are directed only to the Board. Similarly, his arguments focus only on the Board. Therefore, although Cramer has joined in the submission of a brief, we shall focus our discussion on the Board.

I. Was Norville's Article 19 rights [sic] violated by the Circuit Court of Anne Arundel County?

II. Did the Circuit Court err when it held that the Eleventh Amendment bars an ADEA suit against the Anne Arundel County Board of Education in State court, and consequently dismissed Norville's ADEA count against the Board?

III. Did the Circuit Court err when it held that there is no private cause of action under Article 49B, § 16, and consequently dismissed Norville's 49B count against the Board?

IV. Did the Circuit Court err when it held that Norville's common law count of Wrongful Discharge against the Board was preempted by both federal and state statutory remedy, and consequently dismissed Norville's Wrongful Discharge count against the Board?

For the reasons set forth below, we shall affirm in part and reverse in part and remand for further proceedings.

### FACTUAL SUMMARY

Appellant began his employment with the Board as a Media Technician in August 1973, and was later promoted to the position of Media Production Specialist. He was discharged by the Board on September 30, 1998.

On November 6, 1998, Norville, then *pro se,* filed a complaint against the Board with the Equal Employment Opportunity Commission (the "EEOC"). He said, in part: "My statement concerns Anne Arundel Co. Public Schools.... My immediate supervisor is Don Cramer, production and Design Super." Norville claimed that he "was discriminated against in violation of the Age Discrimination in Employment Act of 1967, as amended, because of my age, 48, with respect to discipline, and discharge."

In the affidavit Norville submitted with his complaint, he averred that he "was not given a satisfactory reason for the disciplinary action." Appellant added: "I was informed that I

was being discharged because of budgetary reason [sic]."
Norville also averred that, on or about June 24, 1998, he
received "a disciplinary action" from Cramer, asserting that
he was "insubordinate" because he "refused to allow" his wife
to operate a school vehicle to transport photographic equip-
ment.[3] Moreover, appellant claimed that, on September 30,
1998, he was "forced to retire. . . ." Norville recalled:

> I went on vacation on June 29, 1998 for two weeks. Upon
> my return from vacation a letter was sent to me informing
> me that they had received the fy99 budget which reduced
> the number of positions in our department. I was informed
> that I had to apply for the two positions when they were
> posted. In my department they [sic] were other specialists:
> (1) Jenifer Corwin, age mid–20's, Lori Berdequez, age late
> 30's, and Joe Thompson, age late 30's, Steve Greg, age late
> 30's, and myself. I was not selected for the positions, but
> they retained their position.
>
> On September 16, 1998, I received a letter informing me
> that I was not selected for the position. And I was offered
> a demeaning position as Teacher Assistant retaining my
> salary for one year or forced retirement.
>
> *On September 30, 1998, I was forced to retire from my
> position.* I was the only person I am aware of that was
> forced to retire.
>
> *I believe this happened to me because of my age, 48, and
> my salary*—$53,000 yearly plus benefits. All of my co-
> workers are being paid at a lesser rate than I. The school
> system would save a lot of money in their budget.

(Emphasis added).

The EEOC forwarded a copy of the complaint to the
Maryland Commission on Human Relations (the "MCHR" or
the "Commission"). In a letter dated December 22, 1998, the
Commission notified appellant of its receipt of the EEOC

---

3. Appellant also averred that he filed a grievance, but claimed the
Board refused to hear it. Appellees have not asserted that appellant
failed to exhaust his administrative remedies, or that the grievance
process was his sole avenue to redress his claims.

complaint, which it considered as "filed with the [MCHR] as of the date it was filed with EEOC." Further, the Commission advised that, pursuant to a "Worksharing Agreement" between the EEOC and the Commission, the EEOC would investigate the matter in order "to avoid duplication of effort."

After the EEOC completed its investigation, it sent a "Dismissal and Notice of Rights" letter to Norville, dated December 21, 1998, advising that it was "closing its file" because it was "unable to conclude that the information obtained establishes violations of the statutes." However, the EEOC added: "This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge." The EEOC also informed appellant of his "right to sue" under federal law, in either federal or state court, "within 90 days" of the notice.

On March 17, 1999, appellant served notice on the Anne Arundel County Solicitor of an age discrimination claim. He did not specifically refer either to the Local Government Tort Claims Act, Maryland Code (2002 Repl. Vol.), § 5–304 of the Courts and Judicial Proceedings Article ("C.J."), or the Maryland Tort Claims Act, Maryland Code (1984, 1999 Repl. Vol.), § 12–101 through § 12–110 of the State Government Article ("S.G.").

The next day, March 18, 1999, Norville filed suit against appellees in the United States District Court for the District of Maryland, which he later amended on June 2, 1999. *See Norville v. Anne Arundel County Bd. of Educ.*, No. MJG99–764, 1999 WL 1267696. The Amended Complaint contained claims for compensatory and punitive damages based on six grounds: violation of the ADEA; violation of Art. 49B, § 16(a); unjust enrichment; quantum meruit; wrongful discharge; and intentional infliction of emotional distress. Among other things, Norville alleged that Cramer deliberately harassed him in an effort to fabricate a record of unsatisfactory performance by appellant, even though appellant's perform-

ance was exemplary. He also claimed that his position was awarded to a person under the age of 40.

Appellees moved to dismiss the action or, alternatively, for summary judgment. On November 23, 1999, the federal court (Garbis, J.) issued a Memorandum and Order in which it dismissed the ADEA claim against Cramer, with prejudice, and dismissed the remaining claims against Cramer, without prejudice.

In dismissing the ADEA claim against Cramer, the district court noted that appellant's failure to name Cramer in his EEOC complaint constituted a "procedural bar" to the claim against Cramer in his individual capacity.[4] In addition, it agreed with Cramer that, even if he had been properly named in the EEOC complaint, the ADEA does not authorize personal liability against a supervisory employee who discharges an employee. Rather, the ADEA prohibits an *employer* from discriminating based on age. *See* 29 U.S.C. § 630(b) (defining "employer"); *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507 (4th Cir.1994).

In contrast to its ruling as to Cramer, the court stayed the claims against the Board to await the Supreme Court's decision in *Kimel v. Fla. Bd. of Regents*, 157 F.3d 908 (11th Cir.1998), *cert. granted*, 525 U.S. 1121, 119 S.Ct. 901, 142 L.Ed.2d 901 (1999). In January 2000, the Supreme Court decided *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). Thereafter, in reliance on *Kimel,* the district court dismissed the federal claims against the Board, with prejudice, by Order dated February 20, 2001. The court also dismissed the remaining State claims against

---

4. According to the federal court, appellant conceded that he failed to name Cramer, but urged the court to recognize an exception to that requirement based on substantial compliance. The court declined to do so, stating: "The ADEA provides that '[a] civil action may be brought under this section ... against the respondent named in the [EEOC] charge.' 29 U.S.C.A. § 626(e)." Furthermore, citing *Causey v. Balog,* 162 F.3d 795, 801 (4th Cir.1998), the court said: "The Fourth Circuit held that the individual defendants could not be held personally liable under Title VI or the ADEA, due to the plaintiff's failure to name them in his administrative charge."

the Board, without prejudice. In doing so, the court observed: "It appears that Rule 2–101(b) of the Maryland Rules of Procedure would be applicable[ ] with regard to the state law claims over which this Court declines to exercise jurisdiction." [5]

Accordingly, on March 21, 2001, appellant filed suit against appellees in the Circuit Court for Anne Arundel County, alleging age discrimination in violation of Art. 49B, § 16(a); unjust enrichment; quantum meruit; common law wrongful discharge; and intentional infliction of emotional distress. After appellees moved to dismiss, the court held a hearing on September 24, 2001. Thereafter, on November 1, 2001, the court (Lerner, J.) entered an Order dismissing, with prejudice, the unjust enrichment and quantum meruit claims (Counts II, III). The remaining claims were also dismissed, but with leave to amend.

Norville then filed an Amended Complaint on November 26, 2001, consisting of eight counts (i.e., four identical claims against each defendant), for which he sought compensatory and punitive damages of $1,000,000 each and other relief. In particular, he alleged violations of the ADEA (Counts I and V); violations of Article 49B, § 16(a) (Counts II and VI); wrongful discharge (Counts III and VIII); and intentional infliction of emotional distress (Counts IV and VIII).[6]

---

**5.** Rule 2–101(b) provides that, if an action is filed in federal court within the period of limitations and the federal court dismisses the suit because, *inter alia,* the court declines to exercise jurisdiction, the action will be deemed timely filed under Maryland law if filed in State court within thirty days. *But see State v. Sharafeldin,* 382 Md. 129, 148–150, 854 A.2d 1208 (2004) (recognizing that S.G. § 12–202 "is not a mere statute of limitations.... The waiver of the State's immunity vanishes at the end of the one-year period...."; Rule 2–101(b) does not save an action against a State agency for breach of contract when it is timely filed in federal court, but not filed in State court within the time provided by the statute waiving immunity).

**6.** Appellees have not asserted that the ADEA claims against the Board, filed in State court, are barred by *res judicata,* based on the federal court's disposition of the ADEA claim filed in federal court.

On December 6, 2001, appellees moved to dismiss the "compensatory damage claims in Counts I and V and punitive damage claims in Counts I–VIII of the Amended Complaint." As to Norville's claim for damages under the ADEA, appellees asserted that "the ADEA contains no specific authorization for awarding compensatory damages for pain and suffering," and noted that "courts are unanimous in holding that damages for pain and suffering or emotional distress are not recoverable under the ADEA." Appellees also asserted that, "by its terms," the ADEA "does not expressly provide for an award of punitive damages."

Then, on December 13, 2001, appellees moved to dismiss Counts II and VI, as well as Counts III, IV, VII, and VIII of the Amended Complaint. They advanced numerous grounds to support their motion, including sovereign immunity, preemption by "state and federal statutory authorities," and failure to "adequately plead a cause of action for the tort of intentional infliction of emotional distress." In addition, appellees argued that Article 49B of the Maryland Code does not provide for a private right of action.

At the motions hearing on April 9, 2002, appellees' counsel stated: "[O]ne of the reasons we are bringing this motion . . . is to boil this case down to what it really is. *In our opinion, it is a federal ADEA case. . . . [I]t should go forward solely as that.*" (Emphasis added). Further, appellees' attorney asserted:

The motion really raises six issues. And the first issue is the private right of action under Article 49[B] of the Maryland Code, which is essentially the state equivalent of Title 7 in the Age Discrimination Act. And the cases that we cited . . . stand for the proposition that the only party that has standing to bring a cause of action under 49[B] is the Maryland Commission on Human Relations.

And we have cited numerous Fourth Circuit, as well as Maryland state court cases, which essentially say that the only person that could bring a cause of action would be the

state agency and that a private individual cannot bring an action.

To some extent, this statute is cumulative and duplicative of ... the ADEA Act, the Age Discrimination in Employment Act. *Clearly, we don't dispute the fact that the plaintiff can sue the [B]oard under the Age Discrimination in Employment Act.* So 49[B] is really duplicative, and we think it should be dismissed.

(Emphasis added).

Appellees' counsel continued:

My position is, at least as to Article 49[B], the only person [sic] can then bring suit is the Maryland commission. What happened in this case is he filed a claim, or what is called a charge of discrimination, with the EEOC and the Maryland commission. And they treat that as the initial filing of an administrative claim.

\* \* \*

They investigate it. And either agency has the authority to bring suit themselves. The EEOC does under the Age Discrimination in Employment Act. And the Maryland commission under 49[B] also has that right. In this case, they investigated the case and found no violation of the Age Discrimination Act and basically gave him what is called a right to sue notice. And that right to sue notice then allows him to go into federal court or state court under the Age Discrimination in Employment Act, the federal statute, to sue.

It is our position that if you read 49[B], and if you read the entire statute, the only person that can move under that particular statute is the Maryland commission. And as I have said earlier, *we have no argument with his right to file suit under the federal statute. And he can file suit in federal court or state court.*

But for purposes of at least the Age Discrimination in Employment Act, the Maryland commission is the one who

has the jurisdiction, sole jurisdiction, to be the proper plaintiff.

(Emphasis added).

Ruling from the bench, the court (North, J.) dismissed both claims for intentional infliction of emotional distress, because appellant did not plead "severe" or "extreme or outrageous conduct." [7] Thereafter, the court issued a Memorandum Opinion and Order dated May 17, 2002, disposing of the remaining issues.

In its Order, the court granted the motion to dismiss appellant's claim under Article 49B, § 16(a) (Counts II and VI), and his common law wrongful discharge claim (Counts III and VII). The court also dismissed the ADEA claim against Cramer (Count V).

In its Memorandum Opinion, the court noted that appellees had not sought to dismiss the ADEA claim against the Board (Count I). As to the ADEA claim against Cramer (Count V), the court dismissed it for the same reasons previously articulated by the federal court. The circuit court said: "Cramer asserts that the Court should dismiss Count V, because he was not named in the administrative complaint filed with the EEOC and individual liability is not available under the ADEA. This Court agrees." The court added: "Even if Cramer had been named at the EEOC level, individual liability, as opposed to employer liability, is not permitted for delegable personnel decisions."

With respect to the claims under Art. 49B, § 16(a) (Counts II and VI), the court concluded that the statute did not create a private right of action. Therefore, the court determined that the Commission was appellant's sole recourse to address an alleged violation of Article 49B. Concerning appellant's common law wrongful discharge claims (Counts III and VII), the court stated that "a wrongful discharge claim may not lie" because the "statutory remedies provided by Article 49B and

---

7. The court's ruling is reflected in a "Civil Hearing Sheet," signed by the judge.

the ADEA preempt any common law wrongful discharge claim." Citing *Makovi v. Sherwin–Williams* Co., 316 Md. 603, 561 A.2d 179 (1989), and *Insignia Residential Corp. v. Ashton,* 359 Md. 560, 755 A.2d 1080 (2000), the court added: "[I]f the legislature has provided the vehicle by which a plaintiff may remedy a specific employment wrongdoing as an exception to the terminable at-will rule, an abusive discharge claim may not be brought." The court continued:

> Two statutes specifically address the problem of age discrimination: Md. Ann. Code art. 49B, §§ 14–18 and the ADEA. Thus, a judicially created abusive discharge claim to remedy age discrimination is neither permitted or necessary under the holding in *Makovi.* Norville has alleged only an age discrimination suit. The ADEA and Art. 49B provide his only possible remedies.

Further, the court determined that it need not address appellees' arguments regarding sovereign immunity and qualified immunity. Accordingly, appellant's ADEA claim against the Board was then his only surviving claim.

On December 24, 2002, the Board filed a "Preliminary Motion," asking the circuit court to "rule that sovereign/governmental immunity bars Plaintiff's ADEA claim" against it. The Board claimed that it is a State agency and, therefore, it enjoys constitutional immunity from suit under the ADEA, in both State and federal court, pursuant to the Eleventh Amendment.

According to appellant, the Board's motion represented "a complete reversal" of the Board's earlier "legal position." Moreover, appellant argued that immunity under the Eleventh Amendment extends only to suits brought in federal court. In addition, Norville insisted that the Board is not a State agency, and thus it is not entitled to sovereign immunity or the protection of the Eleventh Amendment.

At the hearing on May 1, 2003, the Board argued that "it is well established," both in federal and State court, "that the local board[s] of education are state agencies for purposes of sovereign immunity." The Board added: "State immunity or

sovereign immunity applies not only to the state government, but it applies to state agencies." It said:

> The second issue that we have addressed in our brief is the issue of can the state assert sovereign immunity in a federal ADEA claim in state court. We have cited in section two of our brief several Supreme Court cases. And I think it is fair to say that there has been a major revolution in this area of the law recently: The Kimmell [sic] case, the Seminole case, Seminole Tribe case, and particularly the Alden case.
>
> And in 1999 the Supreme Court in Alden held that the powers delegated to Congress under Article 1 of the United States Constitution do not include the power to subject non-consenting states to private suits for damages in the state court. So what I think what the Supreme Court was saying is that, clearly, when a claimant comes in to state court to assert rights under federal law, particularly employment law, such as the Fair Labors [sic] Standard [sic] Act or the Age Discrimination in Employment Act, clearly the state can impose sovereign immunity both in the federal court under Article 11, as well as traditional notions of sovereign immunity in state court.

Appellant disagreed, claiming that the Board is a "quasi-agency" and, under Article 19 of the Maryland Constitution, appellant is entitled to seek redress of a constitutional tort. With regard to whether the Board is a local or State agency, Norville's lawyer said it did not "make[ ] a lot of difference. . . ."; he maintained that, at the very least, the Legislature waived sovereign immunity up to $100,000. Claiming that the Eleventh Amendment does not apply in State court, appellant asserted:

> I think that this is—this is a constitutional tort, if anything. And it does have a statutory basis. But that statutory basis says in the federal statute that that gives jurisdiction to state and federal courts to hear these types of discriminations. And the reason they got out of it in the federal court was because of the Supreme Court came through with the

Kimmell [sic] decision, saying . . . you can't sue state agencies in a federal court because of the Eleventh Amendment.

The court agreed with the Board. By Order of May 14, 2003, the court (Davis–Loomis, J.) granted summary judgment to the Board as to Count I, stating: "[T]he Eleventh Amendment bars suit against the [Board] on the basis of the [ADEA]. . . ." In its Memorandum Opinion of the same date, the court explained:

States are immune under the Eleventh Amendment from suit in federal court under the ADEA. *Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 91[, 120 S.Ct. 631, 145 L.Ed.2d 522] (2000). The county boards of education in Maryland are state entities that can assert Eleventh Amendment immunity to suit in federal court under the ADEA. *See Barnes v. Anne Arundel County Bd. of Educ.,* Civil No. L–99–1608[, 2000 WL 979108], 2000 U.S. Dist. LEXIS 10695, at *2 (D.Md. July 14, 2000) (stating that "[i]t is well-established that Maryland county school boards are state entities for Eleventh Amendment purposes. Defendant Anne Arundel County Board of Education is thus immune from suit in federal court under the ADEA."); *Jones v. Frederick County Bd. of Educ.,* 689 F.Supp. 535, 538 (D.Md.1988) (stating that "[t]he Frederick County Board of Education is an agent of the State entitled to Eleventh Amendment immunity."). In the instant case, Plaintiff's ADEA claim was dismissed in federal court on the basis of the Board's Eleventh Amendment immunity from suit. . . .

Maryland law provides county boards of education with the power to sue and be sued. Md.Code Ann., Educ. § 3–104(b)(2)(2001 Repl. Vol.) "A county board of education may not raise the defense of sovereign immunity to any claim of $100,000 or less." Md.Code Ann., Cts. & Jud. Proc. § 5–518(c)(2002 Repl. Vol.). "[T]he state's partial waiver of the county boards' sovereign immunity does not constitute a waiver of their constitutional immunity from suit in federal court under the Eleventh Amendment." *Jones,* 689 F.Supp. at 538 (citing *Florida Dept. of Health & Rehabilitative*

*Servs. v. Florida Nursing Home Assn.*, 450 U.S. 147, 150[, 101 S.Ct. 1032, 67 L.Ed.2d 132] (1981)).

\* \* \*

This Court finds that the Eleventh Amendment bars ADEA suits against county boards of education in state courts. The Supreme Court in *Alden v. Maine*, 527 U.S. 706[, 119 S.Ct. 2240, 144 L.Ed.2d 636] (1999), clearly held that "the States retain immunity from private suit in their own courts" as well as in the federal courts. *Alden*, 527 U.S. at 754[, 119 S.Ct. 2240]. In making his argument, Plaintiff fails to address *Alden* and instead cites to federal appeals court cases from 1986 and 1946. . . . It is apparent to this Court that *Alden* controls this issue. *The Maryland Court of Appeals has also recognized that where the State enjoys Eleventh Amendment sovereign immunity from suit in federal court, it enjoys the same immunity in state court. See Robinson v. Bunch*, 367 Md. 432, 439[, 788 A.2d 636] (2002) (stating that "it is clear that the Supreme Court's decision in *Alden v. Maine*, 527 U.S. 706[, 119 S.Ct. 2240, 144 L.Ed.2d 636], requires that we overrule the Court of Special Appeals' holding that the plaintiffs are entitled to maintain this action under the remedial provisions of the [Fair Labor Standards Act] invoked by the plaintiffs. The *Alden* case made it clear that the FLSA could not constitutionally authorize an action such as the one here involved.").

\* \* \*

The Supreme Court in *Alden* made it quite clear that where a State has immunity in the federal courts from an action based on federal law, it enjoys the same immunity in the state courts. *Alden*, 527 U.S. at 754[, 119 S.Ct. 2240]. Even though Maryland has partially waived the sovereign immunity of the county boards of education, it has not waived their Eleventh Amendment constitutional immunity to suit under the ADEA. Clearly, a private plaintiff cannot bring a cause of action based on the ADEA against a county board of education in a Maryland state court. (E.22–23)

Plaintiff also argues that there is a dispute of material fact as to whether the Board is a state or a county agency.

It is clear to this Court that no such dispute exits. *The Court of Appeals has conclusively determined that the county boards of education are state agencies. Montgomery County Educ. Assn. v. Board of Educ. of Montgomery County,* 311 Md. 303, 317[, 534 A.2d 980] (1987); *McCarthy v. Board of Educ. of Anne Arundel County,* 280 Md. 634, 650[, 374 A.2d 1135] (1977). As such, *the county boards of education may assert Eleventh Amendment immunity as agencies of the state.*

(Emphasis added).

The court concluded:

The Eleventh Amendment protects the States from suit unless they have explicitly waived their immunity. Maryland has clearly not waived its immunity from suits brought under the ADEA, and this immunity applies to private actions brought against its agencies in both federal and state courts. Accordingly, the Anne Arundel County Board of Education has a constitutional immunity to suits brought in state court under the ADEA.

We shall include additional facts in our discussion.

## I. DISCUSSION

### A. *The Contentions*

Appellant contends that the circuit court violated his rights under Article 19 of the Maryland Declaration of Rights [8] by erroneously ruling that he cannot sue the Board for violations of the ADEA, Art. 49B, or for the common law tort of wrongful discharge. Asserting that he has a property interest

---

8. Article 19 of the Maryland Declaration of Rights states:

That every man, for any injury done to him in his person or property, ought to have remedy by the course of the Law of the land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay, according to the Law of the land.

*See Dua v. Comcast Cable of Md., Inc.,* 370 Md. 604, 644, 805 A.2d 1061 (2002); *Robinson v. Bunch,* 367 Md. 432, 444, 788 A.2d 636 (2002); *Doe v. Doe,* 358 Md. 113, 127–28, 747 A.2d 617 (2000); *State v. Bd. of Educ. of Montgomery County,* 346 Md. 633, 647, 697 A.2d 1334 (1997).

in his job, appellant complains that he has been deprived of his day in court and has been denied "any remedy." He states:

Having had his EEOC complaint dismissed without any hearing or administrative ruling on the merits, having had his federal complaint dismissed without a hearing on the merits, and having had every count in his state complaint dismissed over the course of three separate motion hearings before three separate circuit court judges spread out over two years, Norville's age discrimination claim was thus fully dismissed without *ever receiving any hearing on the merits at any state of the litigation*—leaving him with no remedy, either common law or statutory, for being discriminated against on the basis of his age.

Further, appellant argues that, under both federal and State law, there is a "clear statutory policy against age discrimination in the workplace." *See* 29 U.S.C. § 623(a)(1); Art. 49B, § 16(a)(1). He notes that Maryland also recognizes the common law tort of wrongful discharge " 'when the motivation for discharge [contravenes some] clear mandate of public policy.' *Adler v. American Standard Corp.*, 291 Md. 31, 47[, 432 A.2d 464] (1981)." Thus, appellant contends that the court "erred when it held that Norville's common law count of Wrongful Discharge against the Board was preempted by both federal and state statutory remedy, while at the same time the Court denied any statutory remedy to Norville." Indeed, Norville maintains that the circuit court's ruling "flies in the face of the clear statutory policy against age discrimination contained in both State and federal law . . . ." He explains:

This ruling would suggest to all county school boards throughout Maryland that they are free to discriminate against their any [sic] employee over the age of 40 on the basis of age, for the Circuit Court has held that there is no statutory or common law remedy available to State employees over the age of 40, victimized by age discrimination in the workplace. This ruling nullifies Article 19 of the Maryland Declaration of Rights.

Appellant also contends that the circuit court erred when it ruled that the Board is a State agency for purposes of sovereign immunity, and that the Eleventh Amendment bars an ADEA claim against the Board. Insisting that the Board is a county agency, Norville argues that "the Board cannot avail itself of sovereign immunity." But, "[e]ven if the Board is a state agency," Norville contends that the State has partially waived its immunity."

In addition, Norville complains that, at the hearing in April 2002, the Board repeatedly conceded that he could bring suit under the ADEA in State court. Yet, despite those representations, in May 2003 the Board articulated what appellant characterizes as "a stunning display of reversal of legal position," and "diametrically contradicted its own concession."

Appellant also maintains that the court "erred when it held that there is no private cause of action under Article 49B, § 16, and consequently dismissed Norville's 49B count." Further, he complains about the dismissal of his wrongful discharge claim.

In response, the Board argues that it is well settled in Maryland that county boards of education are State agencies, and thus they are protected from suit by sovereign immunity and Eleventh Amendment jurisprudence. The Board also claims that the Legislature has not waived sovereign immunity as to the ADEA claims, stating:

A review of Section 5–518, Courts & Judicial Proceedings Article, and Section 4–105, Education Article, Annotated Code of Maryland, reveals no such specific waiver of ADEA claims. In fact, both statutes are a narrow waiver of sovereign immunity; their focus is on traditional tort claims; these statutes do not address federal statutory actions.

Additionally, the Board maintains that appellant has no private right of action under Article 49B of the Maryland Code. It states: "Article 49B itself creates a specific procedure and remedy for the redress of any alleged wrongs. *Parlato v. Abbott Labs.*, 850 F.2d 203, 205 (4th Cir.1988). Article 49B empowers only MCHR to initiate litigation."

Moreover, the Board claims that the statutory remedies under Article 49B and the ADEA preempt any common law claim for wrongful discharge, stating: "Maryland courts do not recognize a cause of action for wrongful discharge (or abusive discharge) when a separate statutory remedy exists that provides an exception to the terminable employment at will doctrine."

The Board also argues that Norville does not have a viable Article 19 claim, because he did "not plead a cause of action under either Article 19 or 42 U.S.C. Section 1983." The Board notes: "Mr. Norville has cited no ADEA case authority to support an Article 19 claim."

We shall discuss these contentions in turn.

## B. STATE OR MUNICIPAL AGENCY

Appellant's ADEA claim is based on 29 U.S.C. § 623. It provides, in part:

### § 623. Prohibition of age discrimination

#### (a) Employer practices

It shall be unlawful for an employer—

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or . . .

\* \* \*

#### (f) Lawful practices; age an occupational qualification; other reasonable factors; laws of foreign workplace; seniority system; employee benefit plans; discharge or discipline for good cause

It shall not be unlawful for an employer, employment agency, or labor organization—

(1) to take any action otherwise prohibited under subsections (a), (b), (c), or (e) of this section where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business, or where the differentiation is based on reasonable factors other than age, or where such practices involve an employee in a workplace in a foreign country, and compliance with such subsections would cause such employer, or a corporation controlled by such employer, to violate the laws of the country in which such workplace is located; . . . .

The circuit court found that the Board is a State agency. Therefore, it concluded that appellant's ADEA claim against the Board was barred by the Eleventh Amendment of the United States Constitution and the doctrine of sovereign immunity. The Eleventh Amendment provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

In reaching its decision, the circuit court relied on *Kimel, supra,* 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522. There, the Supreme Court considered the Eleventh Amendment and sovereign immunity in regard to a private suit against a state to recover damages under the ADEA. It determined that, in enacting the ADEA, Congress "did not validly abrogate the States' sovereign immunity to suits by private individuals." *Id.* at 91, 120 S.Ct. 631.

Appellant challenges the underlying premise of the circuit court's decision. He vigorously maintains that the Board is not an "arm of the state," and thus the Board is not protected from suit, either by the Eleventh Amendment or sovereign immunity.[9]

---

9. Appellant is joined in this view by the Public Justice Center ("PJC") and the American Civil Liberties Union of Maryland ("ACLU"), which have submitted a joint Amici Curiae brief.

Arguing that county school boards are the product of the Legislature, the Board disagrees with Norville. As it recognizes, Md. Code (1978, 2004 Repl. Vol.), § 3–103 of the Education Article ("Ed.") creates a board of education for each county, "with limited authority to control educational matters that affect the county." *Chesapeake Charter, Inc. v. Anne Arundel County Bd. of Educ.*, 358 Md. 129, 135–36, 747 A.2d 625 (2000). Although the Board concedes that, "in terms of their composition, jurisdiction, funding, and focus," the local school boards "have a local flavor," it notes that the Court of Appeals has consistently regarded county school boards as State entities, rather than local agencies.

■ The question of whether the Board is a State or local entity is central because, with regard to the ADEA claim, the doctrine of sovereign immunity does not apply to a county agency; it applies only to the State and its instrumentalities. "[T]he powers delegated to Congress under Article I of the United States Constitution do not include the power to subject nonconsenting States to private suits for damages in state courts." *Alden v. Maine*, 527 U.S. 706, 712, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999). Rather, "[i]n exercising its Article I powers Congress may subject the States to private suits in their own courts only if there is 'compelling evidence' that the States were required to surrender this power to Congress

---

The ACLU and the PJC contend that "county boards of education in Maryland are not entitled to the sovereign immunity conferred upon state government by the U.S. Constitution." Moreover, they argue that "any such immunity has been waived by the General Assembly for amounts up to $100,000 or the limit of the county board's insurance policy." In their view, "the fact that county boards of education are regarded as 'state agencies' for many ... purposes under state law does not in any sense compel the conclusion that county boards are also arms of the state for purposes of sovereign immunity." (*citing Blades v. Woods*, 107 Md.App. 178, 182, 667 A.2d 917 (1995) (concluding that Baltimore City Police Department is a state agency for certain purposes but is " 'not entitled to ... Eleventh Amendment protection.' ") (citation omitted)). While noting that "County boards of education in Maryland [are] 'state agencies' for many other purposes," amici contend that the boards "share the key characteristics of local boards of education in other states that have led [other] courts to determine that they are not 'arms of the state.' " (Citations omitted).

pursuant to the constitutional design." *Id.* at 730, 119 S.Ct. 2240 (citation omitted).

■ As we noted, the court below relied, in part, on the Eleventh Amendment. In *Hess v. Port Authority Trans–Hudson Corp.,* 513 U.S. 30, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994), the Supreme Court explained that the Eleventh Amendment "largely shields States from suit in federal court without their consent, leaving parties with claims against a State to present them, if the State permits, in the State's own tribunals." *Id.* at 39, 115 S.Ct. 394. Similarly, the Court of Appeals recently said: "It was settled over a hundred years ago that the Eleventh Amendment to the United States Constitution [] provides a state with immunity to claims arising under federal law and asserted by a citizen of that state in federal court." *Maryland Military Dep't v. Cherry,* 382 Md. 117, 122, 854 A.2d 1200 (2004). Thus, Congress has no authority to abrogate a state's sovereign immunity in federal or state court, although a state may consent to suit. *Alden,* 527 U.S. at 748, 752, 754–55, 119 S.Ct. 2240.

" 'The [Eleventh] Amendment is rooted in a recognition that the States, although a union, maintain certain attributes of sovereignty, including sovereign immunity.' " *Hess,* 513 U.S. at 39, 115 S.Ct. 394 (citation omitted). The Amendment was adopted for "twin reasons": 1) "the States' fears that 'federal courts would force them to pay their Revolutionary War debts, leading to their financial ruin,' " *id.* (citation omitted), and 2) "the integrity retained by each State in our federal system." *Id.* The "impetus for the Eleventh Amendment" was "the prevention of federal-court judgments that must be paid out of a State's treasury." *Id.* at 48, 115 S.Ct. 394.

[3] Notably, constitutional sovereign immunity "derives not from the Eleventh Amendment but from the structure of the original Constitution itself." *Alden,* 527 U.S. at 728, 119 S.Ct. 2240; *see Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267–68, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997). The *Alden* Court acknowledged, 527 U.S. at 713, 119 S.Ct. 2240, that the Supreme Court has "sometimes referred to the

States' immunity from suit as 'Eleventh Amendment immunity,'" but that phrase, while "convenient shorthand," is also something of a misnomer." *Id.* This is because "the sovereign immunity of the States neither derives from, nor is limited by, the terms of the Eleventh Amendment." *Id.* Rather, "the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today. . . ." *Id.* As the *Alden* Court said, "The Eleventh Amendment confirmed, rather than established, sovereign immunity as a constitutional principle[.]" *Id.* at 728–29. Thus, the parameters of constitutional sovereign immunity for the states and its instrumentalities are determined "by fundamental postulates implicit in the constitutional design." *Id.* at 729, 119 S.Ct. 2240. *See Federal Maritime Comm'n v. South Carolina State Ports Auth.*, 535 U.S. 743, 753, 122 S.Ct. 1864, 152 L.Ed.2d 962 (2002) ("[T]he Eleventh Amendment does not define the scope of the States' sovereign immunity; it is but one particular exemplification of that immunity").

■ "[S]overeign immunity is rooted in the common law and 'is firmly embedded in the law of Maryland.'" *Stern v. Board of Regents, University Sys. of Md.*, 380 Md. 691, 700, 846 A.2d 996 (2004) (citation omitted). The doctrine "precludes suit against governmental entities absent the State's consent." *ARA Health Servs., Inc. v. Dep't of Public Safety and Corr. Servs.*, 344 Md. 85, 91–92, 685 A.2d 435 (1996); *see Sharafeldin, supra*, 382 Md. at 140, 854 A.2d 1208 ("[T]he origin of the doctrine of sovereign immunity in Maryland did not stem from judicial fiat but was statutory in nature, and '[w]e have consistently declined to abrogate sovereign immunity by judicial fiat'") (citation omitted). Thus, the Court of Appeals has "held, consistently, that immunity from suit is 'one of the highest attributes of sovereignty,' and that any waiver of that immunity must come from the Legislature." *Sharafeldin*, 382 Md. at 140, 854 A.2d 1208 (citation omitted).

■ While "[t]he bar of the Eleventh Amendment to suit in federal courts extends to States and state officials," it "does

not extend to counties and similar municipal corporations." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *see Alden*, 527 U.S. at 756, 119 S.Ct. 2240 (recognizing that the State's sovereign immunity "does not extend to suits prosecuted against a municipal corporation or other governmental entity which is not an arm of the State"). Only the states themselves, or a state agency or instrumentality that functions as an "arm of the State," is entitled to invoke sovereign immunity or the immunity afforded by the Eleventh Amendment. *See Regents of the Univ. of California v. Doe*, 519 U.S. 425, 429, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997); *Condon v. State*, 332 Md. 481, 492, 632 A.2d 753 (1993). Therefore, the state/local conundrum requires careful scrutiny; we must determine whether the Board is an arm or instrumentality of the State, entitled to the protections of sovereign immunity, or, instead, is to be treated as a county agency, to which sovereign immunity does not apply.

■ The federal cases suggest several factors that are pertinent to the analysis of whether a particular entity is regarded as an arm of the state.[10] Paramount among them is the so called "State treasury" factor, i.e., whether an adverse judgment against the entity would be paid from the State's treasury. The three "additional factors" are: "(1) the degree of control that the State exercises over the entity or the degree of autonomy from the State that the entity enjoys; (2)

---

**10.** In *Mancuso v. N.Y. State Thruway Auth.*, 86 F.3d 289 (2d Cir.), *cert. denied*, 519 U.S. 992, 117 S.Ct. 481, 136 L.Ed.2d 375 (1996), the Second Circuit observed that the "jurisprudence over how to apply the arm-of-the-state doctrine is, at best, confused." *Id.* at 293. That court identified six factors relevant to determining whether an entity is an arm of the state, derived from *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979). They are, 86 F.3d at 293:

(1) how the entity is referred to in the documents that created it; (2) how the governing members of the entity are appointed; (3) how the entity is funded; (4) whether the entity's function is traditionally one of local or state government; (5) whether the state has a veto power over the entity's actions; and (6) whether the entity's obligations are binding upon the state.

the scope of the entity's concerns—whether local or state-wide—with which the entity is involved; and (3) the manner in which State law treats the entity." *Cash v. Granville County Bd. of Educ.*, 242 F.3d 219, 224 (4th Cir.2001).

The Supreme Court observed in *Hess, supra*, 513 U.S. at 48, 115 S.Ct. 394, that the "vulnerability of the State's purse" is the "most salient factor in Eleventh Amendment determinations." It noted that, when a state is not obligated to bear and pay the judgment of a public entity, "the Eleventh Amendment's core concern is not implicated." *Id.* at 51, 115 S.Ct. 394. Similarly, the Fourth Circuit said in *Cash*, 242 F.3d at 223: "The principal factor, upon which courts have virtually always relied, is whether a judgment against the governmental entity would have to be paid from the State's treasury." *See Alkire v. Irving*, 330 F.3d 802, 811 (6th Cir.2003)("[W]e now recognize that the question of who pays a damage judgment against an entity as the most important factor in arm-of-the-state analysis, though it is unclear whether it is the only factor or merely the principal one."); *Eason v. Clark County Sch. Dist.*, 303 F.3d 1137, 1141 (9th Cir.2002) ("[W]hether a money judgment will be satisfied out of state funds—is the most important [factor]."), *cert. denied*, 537 U.S. 1190, 123 S.Ct. 1262, 154 L.Ed.2d 1023 (2003). The "additional factors" seek to ensure that a judgment against the entity would not infringe the state's "sovereign dignity." *Cash*, 242 F.3d at 224.

In *Cash, supra*, 242 F.3d 219, the Fourth Circuit considered "whether the Granville County (North Carolina) Board of Education enjoys Eleventh Amendment immunity in a suit brought by an employee against it under the Fair Labor Standards Act for overtime pay." *Id.* at 221. The court concluded that the "Board is more like a county than an arm of the State...." *Id.*

In analyzing whether the county board of education was to be treated as an arm of the State of North Carolina, the Fourth Circuit observed that there is "no bright line of demarcation" that separates state entities, entitled to Elev-

enth Amendment protection, from "local governmental enti-
ties," which are not. *Id.* at 223. Citing *Hess, supra,* the
Fourth Circuit noted that, when there is a conflict in "the
factors for resolving whether a governmental entity is an arm
of State or more like a county or municipality," *id.,* the courts
seek "guidance in the 'twin reasons' for the Eleventh Amend-
ment." *Id.* Those reasons " 'dominate' any analysis of wheth-
er a governmental entity is to be accorded Eleventh Amend-
ment immunity." *Id.* (citation omitted in *Cash*).

As we noted, the court pointed to several factors to resolve
whether the county school board was a state entity. The *Cash*
court said that, "if the State treasury will be called upon to
pay a judgment against a governmental entity, then Eleventh
Amendment immunity applies to that entity, and consideration
of any other factor becomes unnecessary." *Id.* at 223. Con-
versely, it determined that "a finding that the State treasury
will not be affected by a judgment against the governmental
entity weighs against finding that entity immune." *Id.* at 224.
In that circumstance, the court considers whether the three
"sovereign dignity" factors, identified above, compel a con-
trary conclusion. *Id.* at 225.

The Fourth Circuit analyzed various statutory provisions
pertinent to the matter of the autonomy of the county school
boards. *Id.* at 225–26. In particular, it noted that local school
boards may purchase liability insurance to satisfy judgments
against them; may retain private counsel without seeking
permission from the state's Attorney General; are " 'unit[s] of
local government' authorized to enter into interlocal coopera-
tive agreements"; and may declare bankruptcy under federal
law. *Id.* at 225. Moreover, it pointed out that the members
of school boards are locally elected, and it is the local board
that enforces the statewide rules for teacher certification and
curriculum. *Id.* at 225–26. Accordingly, the Fourth Circuit
concluded that the county board "appears much more akin to a
county in North Carolina than to an arm of the State." *Id.* at
226. In its view, "any judgment rendered against a local
school board would not ... affront the dignity of the State."
*Id.*

In contrast to *Cash,* we are mindful that, historically, the Court of Appeals has almost always regarded local school boards as agencies of the State. For example, in *Board of Educ. of Prince George's County v. Prince George's County Educators' Ass'n, Inc.,* 309 Md. 85, 95–96 n. 3, 522 A.2d 931 (1987), the Court of Appeals stated: "County boards of education are, of course, state agencies and not agencies of the county governments." Numerous other cases reach the same conclusion. *See, e.g., State v. Bd. of Educ. of Montgomery County,* 346 Md. 633, 635 n. 1, 697 A.2d 1334 (1997) ("The various county boards of education are State agencies."); *Board of Educ. of Prince George's County v. Town of Riverdale,* 320 Md. 384, 387 n. 3, 578 A.2d 207 (1990)("It is settled that county boards of education are State agencies."); *Board of Educ. of Prince George's County v. Secretary of Personnel,* 317 Md. 34, 44, 44 n. 5, 562 A.2d 700 (1989) ("The reason is that the [county school] Board is a state government agency; it is a creature of the State, an arm of the State"; "It is settled that county boards of education are State agencies."); *Montgomery County Educ. Ass'n v. Bd. of Educ. of Montgomery County,* 311 Md. 303, 317, 534 A.2d 980 (1987)("Local boards are state agencies, and, as such, are responsible to other appropriate state officials and to the public at large."); *Hornbeck v. Somerset Co. Bd. of Educ.,* 295 Md. 597, 620–32, 458 A.2d 758 (1983) (tracing "statewide system of free public schools" to the adoption of the Maryland Constitution of 1864.); *McCarthy v. Bd. of Educ. of Anne Arundel County,* 280 Md. 634, 651, 374 A.2d 1135 (1977) ("We conclude . . . that the County Council of Anne Arundel County was without power to legislate in this field and to place additional duties upon a State agency, the Board of Education of Anne Arundel County.").

Moreover, several decisions issued by the United States District Court for the District of Maryland have recognized that county boards of education in Maryland share the sovereign immunity from suit enjoyed by the State. In *Lewis v. Bd. of Educ. of Talbot County,* 262 F.Supp.2d 608 (D.Md. 2003), for example, a former employee of the Talbot County

Board of Education brought suit against the board and its agents for breach of contract, wrongful discharge, promissory estoppel, and violations of federal and state constitutional rights. *Id.* at 610. The defendants asserted, *inter alia,* that they were protected from suit by sovereign immunity, pursuant to the Eleventh Amendment. *Id.* at 612. The federal court concluded that the Board was entitled to immunity with respect to all claims, because it is an arm of the state. *Id.* at 612–14.

In its analysis, the court considered the factors discussed in *Cash* to determine whether suit against the school board "essentially constitutes suit against the state. . . ." *Id.* at 613. Although the court noted that "the scope of concern" of the Talbot County School Board "is more local than statewide," *id.* at 613, and acknowledged that this "factor tilts slightly against a finding of sovereign immunity," *id.* at 614, the court was satisfied that it was "outweighed by the other factors." *Id.* Among other things, the court observed that "Maryland law, through statute and judicial opinion, treats the county school boards as agents of the state." *Id.* The court reasoned, *id.* at 613:

> The Talbot County School Board is less autonomous than the board at issue in *Cash* in many respects. Among other things, the Talbot County Board's members are appointed by the Governor of Maryland, not locally elected. *See* Md.Code Ann., Educ. § 3–108. In Maryland, the Board may buy, sell, and hold property only with the approval of the State Superintendent. *See id.* at § 4–115. Each new school established by the Talbot County Board becomes a "part of the State program of public education." *Id.* at § 4–109. The Board's employment and teacher certification practices are more closely regulated in Maryland than those of the boards in North Carolina. *See, e.g., id.* at §§ 6–202 & 4–205(c) (the state, through the State Board of Education, is the ultimate judge of the validity of dismissals for both professional and non-professional employees); Md. Regs. Code tit. 13A § 07.02.01 (state controls form of contract for certificated employees); Md. Regs. Code tit. 13A §§ 12, *et*

*seq.* (state defines and enforces teacher certification require-
ments). While both boards exercise some budgetary discre-
tion, the Talbot County board must submit to an annual
audit conducted by the state. *See* Md.Code Ann., Educ.
§ 5–113. Moreover, the State of Maryland retains the
power to reconstitute and oversee the operation of schools
that do not meet state standards for student performance.
*See* Md. Regs. Code tit. 13A § 01.04.08. The Talbot County
School Board does not operate with the same degree of
autonomy as do the school boards of North Carolina.

Similarly, in *Biggs v. Bd. of Educ. of Cecil County,* 229
F.Supp.2d 437 (D.Md.2002), the plaintiffs, parents of an epilep-
tic daughter, sought monetary damages on her behalf under
the Americans with Disabilities Act. *Id.* at 438–39. They
argued that the Board of Education of Cecil County was not
entitled to invoke the protection of the Eleventh Amendment
because it is not an instrumentality of the State. *Id.* at 443.
The federal court disagreed, concluding that the board is a
state agency for the purpose of Eleventh Amendment analysis.
*Id.* at 444. Relying, *inter alia,* on *Chesapeake Charter, Inc. v.
Anne Arundel County Bd. of Educ.,* 358 Md. 129, 747 A.2d 625
(2000), the court said: "Maryland law consistently and re-
peatedly has treated local school boards as agencies of the
state." 229 F.Supp.2d at 444 (footnote omitted).

The *Biggs* court explicitly addressed the criteria articulated
by the Fourth Circuit in *Cash, supra,* 242 F.3d 219, and
determined that the local board met those criteria and was
immune from suit. It stated, 229 F.Supp.2d at 444:

The Court concludes that the Board is a state agency for
the purposes of the Eleventh Amendment. First, the State
of Maryland exercises a great degree of control over Mary-
land county school boards. Senior Judge Joseph H. Young
of this Court noted in *Jones [v. Frederick County Bd. of
Educ.,* 689 F.Supp. 535, 537–38 (1988)] that,

Maryland law creates the county boards of education and
governs their composition and membership.... The coun-
ty boards must obtain the state's approval regarding the

establishment of schools, acquisition or disposition of property, construction or renovation of buildings, and curriculum. The state appropriates substantial funds to support the county boards. In return, the county boards must acquiesce to an annual audit and submit an annual budget to the state....

*See also Adams v. Calvert County Pub. Schs.*, 201 F.Supp.2d 516, 521 (D.Md.2002) (recognizing that "[b]oth state and federal courts in Maryland ... have 'consistently held that the county boards of education are agencies of the state' and that 'the Maryland statute clearly supports this conclusion.' ") (internal citations omitted); *Rosenfeld v. Montgomery County Pub. Schs.*, 41 F.Supp.2d 581, 586 (D.Md.1999) (concluding, in race discrimination case against the Montgomery County Board of Education and others, that suit was barred by the Eleventh Amendment because the school board is a State entity, and finding, under Maryland law, that Ed. § 4–105(a) does not constitute a waiver for claims less than $100,000, because the State did not explicitly consent to suit); *Jones v. Frederick County Bd. of Educ.*, 689 F.Supp. 535, 538 (D.Md. 1988) (concluding that Frederick County Board of Education "is an agent of the State of Maryland entitled to Eleventh Amendment immunity.").

 County boards of education in Maryland seem to have a "peculiar hybrid nature," with attributes of both State and county government. *Dean v. Bd. of Educ. of Cecil County,* 71 Md.App. 92, 98, 523 A.2d 1059, *cert. denied,* 310 Md. 490, 530 A.2d 272 (1987). Here, the Board operates 108 elementary, middle, and high schools, with nearly 75,000 students. And, for fiscal year 2003, it had an operating budget of over 633 million dollars.[11] While we are tempted simply to parrot what the cases cited above have said as to the arm of the State status of county school boards, the importance of the issue warrants a more careful analysis.

11. *See* "Facts about Anne Arundel County's Public School System," available at *www.aacps.org/aacps/boe/ADMIN/PINFO/info.asp.*

It is helpful to begin with a review of the legislative scheme governing public education in Maryland. The General Assembly has crafted a statutory scheme that confers broad authority upon the State Board of Education as well as local school boards. At the same time, it imposes limitations upon the respective powers of the local boards and the State Board.

County schools systems are funded partly by the State and partly by the individual counties. *Hornbeck, supra,* 295 Md. at 604, 458 A.2d 758. The jurisdiction of "each county school system" is coextensive with the "geographical boundary of the county." Ed. § 3–102. Each county board is an independent "corporate body," with the right to "sue and be sued." Ed. § 3–104 (emphasis omitted). Moreover, the purpose of the county boards is generally local. *See* Ed. § 4–101(a) and (b) (stating that "[e]ducational matters that affect the counties shall be under the control of a county board of education in each county," with authority to "seek in every way to promote the interests of the schools under its jurisdiction"). Pursuant to Ed. § 4–108(3), county school boards "determine, with the advice of the county superintendent, the educational policies of the county school system," subject to State law and applicable bylaws, rules, and regulations of the State Board of Education. However, county school boards must comply with State requirements regarding certification of teachers (Ed. § 6–201) and curriculum (Ed. § 4–111).

County boards have the power to hold property, Ed. § 4–114, and to condemn property without State approval. Ed. § 4–119. In addition, a county school board may consolidate schools, Ed. § 4–120, and enter into cooperative agreements for the joint administration of programs. Ed. § 4–123.[12] They also enjoy considerable latitude in budgetary matters. Ed. §§ 5–102, 5–103. But, the State retains supervisory control over local development of school property. Although

---

12. Such an agreement must be approved by the county governing body and can be frustrated by the State only if the Attorney General determines that the agreement "is not in proper form or not compatible with the laws of" Maryland. *Id.* § 4–123(c).

county boards may purchase real property, build and remodel school buildings, and select land for school sites, they may only do so with the approval of the State Superintendent of Schools.[13] Ed. §§ 2–303(f), 4–115, 4–116.

Notably, county school boards are entrusted with considerable control over matters of personnel. Ed. §§ 4–103(a); 6–201. This includes the right to establish qualifications for teachers and administrators, Ed. § 6–201(f), and to dismiss employees for cause. Ed. § 6–202.

Ed. § 4–103, captioned **"School personnel,"** provides, in part:

(a) *Appointment and Salary.*—On the written recommendation of the county superintendent and subject to the provisions of this article, each county board shall:

(1) Appoint all principals, teachers, and other certificated and noncertificated personnel; and

(2) Set their salaries.

Ed. § 6–201 is also relevant. It states:

**§ 6–201. Appointment, tenure, and qualifications.**

(a) *Authority of county board to employ personnel.*—The county board shall employ individuals in the positions that the county board considers necessary for the operation of the public schools in the county.

(b) *Appointment of professional personnel.*—

(1) The county superintendent shall nominate for appointment by the county board:

(i) All professional assistants of the office of county superintendent; and

(ii) All principals, teachers, and other certificated personnel.

(2) As to these personnel, the county superintendent shall:

(i) Assign them to their positions in the schools;

(ii) Transfer them as the needs of the schools require;

---

**13.** The State superintendent's approval is required for remodeling only if the cost exceeds $350,000. Ed. § 2–303(f)(1)(ii).

(iii) Recommend them for promotion; and

(iv) Suspend them for cause and recommend them for dismissal in accordance with § 6–202 of this subtitle.

(c) *Appointment of clerical and nonprofessional personnel.-*

(1) Except in Worcester County and Baltimore City, the county superintendent shall appoint clerical and other nonprofessional personnel. . . .

\* \* \*

(f) *Qualifications, tenure, and compensation of appointees.*-Subject to the provisions of this article, the qualifications, tenure, and compensation of each appointee shall be determined by the county board. . . .

Ed. § 6–202, which pertains to employee discharge, states, in part:

### § 6–202. Suspension or dismissal of teachers, principals and other professional personnel.

(a) *Grounds and procedure for suspension or dismissal.-*

(1) On the recommendation of the county superintendent, a county board may suspend or dismiss a teacher, principal, supervisor, assistant superintendent, or other professional assistant for:

(i) Immorality;

(ii) Misconduct in office, including knowingly failing to report suspected child abuse in violation of § 5–704 of the Family Law Article;

(iii) Insubordination;

(iv) Incompetency; or

(v) Willful neglect of duty.

(2) Before removing an individual, the county board shall send the individual a copy of the charges against him and give him an opportunity within 10 days to request a hearing.

(3) If the individual requests a hearing within the 10–day period:

(i) The county board promptly shall hold a hearing, but a hearing may not be set within 10 days after the county board sends the individual a notice of the hearing; and

(ii) The individual shall have an opportunity to be heard before the county board, in person or by counsel, and to bring witnesses to the hearing.

(4) The individual may appeal from the decision of the county board to the State Board. . . . [14]

Ed. § 2–303 governs the powers and duties of the State Superintendent of Schools. It provides, in part:

(g) *Certification.*—(1) The State Superintendent shall certificate the professional personnel in each public school in accordance with this article and subject to the bylaws, rules, and regulations of the Professional Standards and Teacher Education Board.

(2) Renewal requirements for any professionally certificated employee may be waived if:

(i) The renewal is recommended by the county superintendent having jurisdiction over the employee; and

(ii) The professionally certificated employee is:

1. 55 years old or older; or

2. Employed in public or approved nonpublic school service for at least 25 years.

Of significance here, the Legislature has waived the boards' immunity from suit up to $100,000, or the limits of the applicable insurance coverage. Ed. § 4–105(d) states:

**§ 4–105. Comprehensive liability insurance; defense of sovereign immunity.**

\* \* \*

(d) *Defense of sovereign immunity.*—*A county board shall have the immunity from liability described under § 5–518 of the Courts and Judicial Proceedings Article.*

In turn, C.J. § 5–518 provides, in part:

---

14. Appellees have not argued that appellant's only remedy was that provided by Ed. § 6–202.

### § 5–518. Same—County boards of education.

(b) *Claims for more than $100,000.—A county board of education, described under Title 4, Subtitle 1 of the Education Article, may raise the defense of sovereign immunity to any amount claimed above the limit of its insurance policy or, if self-insured or a member of a pool described under § 4–105(c)(1)(ii) of the Education Article, above $100,000.*

(c) *Claims for $100,000 or less.—A county board of education may not raise the defense of sovereign immunity to any claim of $100,000 or less . . . .*

\* \* \*

(h) *Judgment levied against board.*—Except as provided in subsection (e), (f), or (g) of this section, a judgment in tort for damages against a county board employee acting within the scope of employment, a county board member acting within the scope of the member's authority, or a volunteer acting within the scope of the volunteer's services or duties shall be levied against the county board only and may not be executed against the county board employee, the county board member, or the volunteer personally.

(Emphasis added).

The amici recognize that the county school boards receive significant funding from the State. But, they argue that it is not "important" that a school board "would use money it receives from the state to pay judgments against it. . . ." In their view, such an argument "would transform any government entity that receives state funds into an arm of the state." They also point out that "cities and counties typically receive substantial funds from the state, yet are not considered arms of the state." Moreover, they maintain that a similar argument was rejected in *Mt. Healthy, supra,* 429 U.S. at 280–81, 97 S.Ct. 568, in which the Supreme Court concluded that a local Ohio board of education was not an arm of the state, even though it received "a significant amount of money from the State." *See also Doe, supra,* 519 U.S. at 428, 117 S.Ct. 900 (" 'The question is not who pays in the end; it is who is legally

obligated to pay the judgment that is being sought.' ") (citation omitted); *see also Ambus v. Granite Bd. of Educ.,* 995 F.2d 992, 996 (10th Cir.1993) (en banc) ("The proper [state treasury factor] analysis focuses on whether the damage award would be paid *directly* by the state treasury, rather than indirectly through commingled state and local funds or state indemnification provisions.") (emphasis in original).

Instead, amici claim that the important issue is "whether the state itself would be liable for a judgment against the entity." Clearly, the statutory scheme obligates the Board, not the State, to pay any adverse judgment. In particular, Ed. § 4–105 requires county boards of education to procure "comprehensive liability insurance to protect the board and its agents and employees," with "minimum liability coverage of not less than $100,000 for each occurrence." Moreover, in the event of litigation, county school boards are not represented by the Attorney General. Instead, they are authorized to retain counsel.[15] *See* Ed. § 4–104. Indeed, the Board is represented here by the County Attorney's Office, not the Maryland Attorney General.

Maryland has a mixed system for choosing members of its county boards of education; the boards of about half of Maryland's counties are locally elected. *See* Ed. § 3–114. Seven of the eight members of the Anne Arundel County Board of Education are appointed by the governor. *See* Ed. § 3–108(a); § 3–110.

The Court of Appeals was certainly mindful of the statutory scheme and the precise issue presented here when it decided *Chesapeake Charter, Inc. v. Anne Arundel County Bd. of Educ.,* 358 Md. 129, 747 A.2d 625 (2000). That case suggests to us that, under very limited circumstances, a county board of education in Maryland is to be treated as a local agency rather than as an arm of the State.

---

15. In Baltimore County, the Board may retain counsel to represent it in matters involving the County Government. Ed. § 4–104(a),(b).

*Chesapeake Charter, Inc.* involved "a procurement dispute" between three school bus contractors and the Anne Arundel County Board of Education. *Id.* at 131, 747 A.2d 625. The Court had to determine "whether the procurement of services by a county board of education is subject to [the State's] General Procurement Law." *Id.* Although the Court answered in the negative, we do not construe the opinion as a harbinger of change in regard to state arm analysis.

In that case, the bus contractors protested the school board's solicitation of bids for student transportation routes. When their protest was denied, they filed an appeal with the Maryland State Board of Contract Appeals ("MSBCA"). *Id.* at 132–33, 747 A.2d 625. The purchasing officer was of the view that the county board was not subject to the State's procurement law or the jurisdiction of the MSBCA. *Id.* at 133, 747 A.2d 625. She noted that county school boards are "authorized to enter into procurement contracts, pursuant to their own procedures, subject to administrative review by the State Board of Education...." *Id.* at 132, 747 A.2d 625. After the State Board of Education intervened as an interested party, both the Anne Arundel County Board and the State Board moved to dismiss the contractors' appeal, claiming that the MSBCA had no jurisdiction to consider the protest because the County Board was not subject to the State's procurement law. *Id.* at 133, 747 A.2d 625. The MSBCA dismissed the appeal, concluding "that, although county boards of education may be State agencies for some purposes, they are not units in the Executive Branch of the State Government for purposes of the General Procurement Law and are therefore not subject to that law." *Id.*

Following the circuit court's affirmance, the Court of Appeals was tasked with deciding whether the Anne Arundel County School Board was subject to the State's General Procurement Law. Relying on earlier decisions of the Court of Appeals holding that county school boards are State agencies, rather than county agencies, the contractors argued that the board was subject to State procurement law. The County School Board, joined by the State Board of Education, claimed

that the County Board was *not* subject to the State's General Procurement Law. *Id.*

The Court noted that Maryland Code (2001 Repl. Vol.), § 11–202 of the State Finance and Procurement Article ("SFP"), provides that the General Procurement Law applies to " 'each expenditure by a unit under a procurement contract.' " *Id.* at 134, 747 A.2d 625 (citing SFP § 11–202). Moreover, the MSBCA is vested with jurisdiction to hear appeals from the "final action of a unit" concerning a protest relating to a procurement contract. SFP § 15–211. While recognizing that the award of a bus transportation contract by a county school board is an "expenditure" under a procurement contract, *id.* at 134, 747 A.2d 625, the Court reasoned that whether the school board is subject to the General Procurement Law and MSBCA jurisdiction "hinges on whether a county school board is 'a unit' within the meaning of that law." *Id.*[16]

The Court recognized that, "in terms of their composition, jurisdiction, funding, and focus," county school boards "clearly have a local flavor, [yet] the county school boards have consistently been regarded as State, rather than county, agencies." *Id.* at 136, 747 A.2d 625. The Court elaborated, *id.* at 135–36, 747 A.2d 625:

> County school boards are creatures of the General Assembly. Section 3–103 of the Education Article (ED) creates such a board for each county, with limited authority to control educational matters that affect the county. *See* ED § 4–101. In 13 counties, the members of the board are elected by the voters of the county (§ 3–114); in Baltimore

---

**16.** The term "unit" is defined by SFP § 11–101(x), as follows:

(1) "Unit" means an officer or other entity that is in the Executive Branch of the State government and is authorized by law to enter into a procurement contract.

(2) "Unit" does not include:

(i) a bistate, multistate, bicounty, or multicounty governmental agency; or

(ii) a special tax district, sanitary district, drainage district, soil conservation district, water supply district, or other political subdivision of the State.

City, the members of the board, other than a student member, are appointed jointly by the Governor and the Mayor of Baltimore (§ 3–108.1); in the other counties, the members are appointed by the Governor from among the residents of the county (§ 3–108). The county school systems are funded in part by the State and in part by the counties. *Hornbeck v. Somerset Co. Bd. of Educ.*, 295 Md. 597, 458 A.2d 758 (1983).[ ]

Of significance here, the Court elucidated the underlying rationale delineating county boards as state agencies. It said, *id.* at 136–37, 747 A.2d 625:

County school boards are considered generally to be State agencies because (1) the public school system in Maryland is a comprehensive State-wide system, created by the General Assembly in conformance with the mandate in Article VIII, § 1 of the Maryland Constitution to establish throughout the State a thorough and efficient system of free public schools, (2) the county boards were created by the General Assembly as an integral part of that State system, (3) their mission is therefore to carry out a State, not a county, function, and (4) they are subject to extensive supervision by the State Board of Education in virtually every aspect of their operations that affects educational policy or the administration of the public schools in the county.

Notably, the Court carved out a particular area in which a local board is not deemed an agency of the State. It said: "Although legally State agencies for those reasons, they are not normally regarded, for structural or budgetary purposes, as units within the Executive Branch of the State government." *Id.* at 137, 747 A.2d 625. It added: "This becomes evident when we examine the place of county school boards in the structure and governance of public education in Maryland." *Id.* at 137, 747 A.2d 625. The Court explained, *id.*:

In carrying out the mandate of Article VIII, § 1 [of the State Constitution], the Legislature created a deliberate and well-defined balance between State government structures and State-based but predominantly local structures. The

State government structure for primary and secondary education is the State Department of Education, created by ED § 2–101 "as a principal department of the State government." The Department consists of (1) the State Board of Education, which is the head of the Department (§ 2–102) and is vested with ultimate supervisory authority for determining educational policy in Maryland and administering the public school system, (2) the State Superintendent of Schools, who is a member of the Governor's Executive Council (§ 2–303(d)) and serves, in essence, as the chief executive officer of the Department, and (3) the other professional, administrative, and clerical employees employed by the Department, who are State government employees for budgetary and personnel purposes. *See* FY 2000 Maryland State Budget, Part II at 283, showing 1,344 authorized positions for the State Department of Education and an appropriation of nearly $67 million to pay those employees.

Further, the Court stated, *id.* at 137–38, 747 A.2d 625:

The authority of the State Board of Education, codified in part in ED § 2–205, has been described as "a visitatorial power of the most comprehensive character," one that is "in its nature, summary and exclusive." *Wiley v. Allegany County School Comm'rs,* 51 Md. 401, 405–06 (1879); *Zantzinger v. Manning,* 123 Md. 169, 178, 90 A. 839, 842 (1914); *Wilson v. Board of Education,* 234 Md. 561, 565, 200 A.2d 67, 69 (1964). It includes (1) determining the primary and secondary educational policies of the State, (2) explaining the true intent and meaning, causing to be carried out, and deciding all controversies and disputes arising under the provisions of the Education Article that are within its jurisdiction,[ ] (3) adopting by-laws, having the force of law, for the administration of the public schools, (4) through the State Superintendent of Schools, exercising general control and supervision over the public schools and educational interests of the State, (5) preparing the annual State public school budget, including appropriations for State aid to the counties for current expenses, student transportation, and

public school construction, and (6) specifying the information each county board is required to record and the form in which it is to be recorded.

Also, the Court observed that the General Assembly has created for each county a county department of education "that, in structure, generally mirrors that of the State Department of Education." *Id.* at 138, 747 A.2d 625. It explained, *id.* at 138–39, 747 A.2d 625:

> The county school board is the head of the county department and is responsible for administering, in the county, the supervening State policy determined by the State Board of Education, in accordance with State Board's directives.[1] *See* ED § 4–108. There is, as well, a county superintendent, who is the executive officer of the county board and, in essence, the chief executive officer of the county department. *Finally, there are the teachers, principals, and other professional, administrative, clerical, security, transportation, and maintenance staff hired by the county* school board to work in or service the schools in the county. Unlike the situation at the State level, *the county superintendent and the employees of the county department of education are appointed and their salaries are set by the county school board upon recommendation of the county superintendent, § 4–103(a), in accordance with a personnel system established by the county board.*

(Emphasis added).

The Court continued:

> As we indicated, *the State currently provides approximately 42% of the current operating revenues of the county boards.* Most of those funds are appropriated by the General Assembly to the State Department of Education for pass-through to the county boards, either in conformance with the basic current expense sharing formula set forth in ED § 5–202 or pursuant to other State aid provisions in title 5 of that article[1]. . . . *None of the major appropriations for operating expenses are made directly by the General Assembly to the county boards. The county boards*

*prepare and submit their annual budgets to the respective county governments which, subject to certain limitations and requirements, have ultimate approval power over them.* See ED §§ 5–102 and 5–103; 76 Op. Atty. Gen. 181, 184 (1991). The State Department of Education, the Governor, and the General Assembly are not directly involved in the budget process for the county boards.

**What this statutory scheme reveals is that, although the county boards are generally regarded as State agencies because they are part of the State public education system, are subject to extensive supervision and control by the State Board of Education, and exercise a State function, from a budgetary and structural perspective, they are local in character. They are not divisions of or units within the State Department of Education.** They are subject to the county, not the State, budget process and must justify their budget requests to the county government. *Most of their operational funding comes from the county, not the State, government. When these factors are taken into account, it is clear that the general characterization of county boards of education as State agencies does not require a finding that they are entities "in the Executive Branch of the State government" for purposes of SFP § 11–101(x).* At the very least, there is an ambiguity as to whether the term "unit," as defined in § 11–101(x), applies to them. That ambiguity requires that we look further, beyond the precise language of § 11–101(x), to determine legislative intent.

*Id.* at 139–40, 747 A.2d 625 (italics and boldface added).

After reviewing the history of the General Procurement Law and the Education Article to glean legislative intent, the Court concluded that a county school board is not a "unit" under State procurement law. *Id.* at 145–46, 747 A.2d 625. It said, *id.* at 143–44, 747 A.2d 625:

Both the history of the 1980 law and the experience under it reveal a number of things relevant to the issue before us. The Legislature was aware that procurement of supplies and services by county school boards was governed by

provisions in the Education Article and that such procurement had never been subject to control by the Board of Public Works or the Department of General Services. It was aware, by contrast, that school construction projects *were* subject to some Board of Public Works control, mostly in terms of which projects and costs the State would fund. The Legislature had before it the basic policy issue of whether to include under the new procurement law procurement by agencies that had not previously been subject to Board of Public Works and Department of General Services jurisdiction, including agencies that were considered to be State agencies but that were predominantly local in character. Some agencies, or types of procurement, it chose to include; others it chose to exclude. *See* SFP, §§ 11–101(x)(2) and 11–203. In Section 24 of the 1980 enactment, the Legislature declared that all laws that were inconsistent with the new procurement law were superseded to the extent of the inconsistency.

In making these choices, the General Assembly left intact, without change, the procurement provisions in the Education Article. That alone indicates an intent to allow the county school boards to continue to operate under those provisions and not subject them to an entirely new regime of substantive and procedural requirements. Of at least equal significance is the fact that most of those provisions have since been amended, demonstrating clearly a legislative recognition that they were not superseded by the 1980 law.[ ]

The Court added:

In the 19 years since the General Procurement Law went into effect, no effort has been made to subject the procurement of supplies and services by county school boards to that law. To the best of our knowledge, with the limited exception noted for school construction, none of the State control agencies—neither the Board of Public Works nor the Departments of Budget and Management or General Services—have ever attempted to exercise jurisdiction over procurement contracts entered into by the county school

boards. Throughout that period, those contracts have been regarded as local matters, subject to supervision on the State level by the State Board of Education. The State Board of Education has, indeed, entertained appeals from non-school construction procurement decisions made by the county school boards, including decisions regarding school bus contracts.

\* \* \*

*We find no basis, upon this analysis, to conclude that the Legislature ever intended to subject procurement by a county school board to the General Procurement Law. It is inconceivable that the General Assembly would have made such a dramatic shift in policy without some clearer indication of its intent to do so.*[1] *We hold, therefore, that a county school board is not a "unit" within the meaning of that law, and, accordingly, that MSBCA has no jurisdiction over disputes arising from procurement decisions made by those boards.*

*Id.* at 144–146, 747 A.2d 625 (emphasis added).

In reaching its conclusion, the Court recognized that "[t]he effects of subjecting county school board procurement to the General Procurement Law are not inconsequential." *Id.* at 145 n. 7, 747 A.2d 625. It explained, *id.*:

Major changes in contract terms and procedure would be required; new duties would be cast upon the Board of Public Works and the Departments of General Services and Budget and Management; and new and expanded jurisdiction would be vested in MSBCA. Apart from these administrative or logistical consequences, subjection of county school board procurement to the General Procurement Law might well put the Board of Public Works, the Department of Budget and Management, and MSBCA in the middle of disputes over textbook and instructional material selection, which the Legislature could not possibly have intended.

As we read *Chesapeake Charter*, the Court left virtually intact the principle that county school boards are ordinarily agencies of the State. The Court recognized only a limited

exception with respect to budgetary matters and procurement. If *Chesapeake Charter* were meant to signal a sea change in regard to a matter of longstanding public policy, we believe the Court would have clearly made that known.

To be sure, numerous federal courts have considered the status of local boards of education and have concluded that they are *not* arms of the state and thus are not entitled to immunity from suit under the federal Constitution. *See, e.g., Mt. Healthy, supra,* 429 U.S. at 280–81, 97 S.Ct. 568 (concluding that local school board in Ohio has "extensive powers to issue bonds ... and to levy taxes" and, "[o]n balance," is "more like a county or city that it is like an arm of the State[;]" therefore, it was "not entitled to assert any Eleventh Amendment immunity from suit in the federal courts."); *Holz v. Nenana City Pub. Sch. Dist.,* 347 F.3d 1176, 1181 (9th Cir.2003) (Alaska) ("[W]e conclude that the School District ... is not an arm of the state. Accordingly, we hold that the School District ... is not immune from suit under the Eleventh Amendment"); *Savage v. Glendale Union High Sch.,* 343 F.3d 1036, 1052 (9th Cir.2003) (Arizona) ("[L]ocal school boards in Arizona cannot invoke the protection of the Eleventh Amendment to immunize themselves from appropriate lawsuits in federal court."), *cert. denied,* 541 U.S. 1009, 124 S.Ct. 2067, 158 L.Ed.2d 618 (2004); *Eason, supra,* 303 F.3d at 1139 (Nevada) ("We reverse the dismissal of the § 1983 and state law claims against all defendants, as well as the ADA and Rehabilitation Act claims against the District, because the Clark County School District is not an 'arm of the state' and therefore does not enjoy Eleventh Amendment immunity."); *Narin v. Lower Merion Sch. Dist.,* 206 F.3d 323, 331 n. 6 (3d Cir.2000) (Pennsylvania) (concluding that school district is not an arm of the state for Eleventh Amendment purposes and is not entitled to sovereign immunity); *Duke v. Grady Mun. Schs.,* 127 F.3d 972, 973 (10th Cir.1997) (New Mexico) ("We hold that local school boards and districts in New Mexico are not arms of the state and are therefore not entitled to Eleventh Amendment immunity."); *Ambus, supra,* 995 F.2d at 997 (Utah)("Because Utah school districts are considered

'political subdivisions' under Utah law, there is significant local board authority over school district operations, and Utah school districts obtain funding at least in part through locally administered property taxes, we conclude that they are not arms of the state for purposes of the Eleventh Amendment. Therefore they are not entitled to immunity from § 1983 suits in federal court."); *Lester H. v. Gilhool*, 916 F.2d 865, 874 (3d Cir.1990) (Pennsylvania) ("Finally, we hold that a Pennsylvania school district, even in its special education capacity, does not acquire the Commonwealth's eleventh amendment immunity."), *cert. denied*, 499 U.S. 923, 111 S.Ct. 1317, 113 L.Ed.2d 250 (1991); *Stewart v. Baldwin County Bd. of Educ.*, 908 F.2d 1499, 1511 (11th Cir.1990) (Alabama) ("We conclude, therefore, that the Baldwin County Board of Education is not an 'arm of the State' for purposes of Eleventh Amendment immunity, and we affirm the district court's denial of summary judgment on the basis of such immunity."); *Rosa R. v. Connelly*, 889 F.2d 435, 438 (2d Cir.1989) (Connecticut) ("We therefore hold that the local board is not entitled to Eleventh Amendment protection from suit in federal court.[1]"), *cert. denied*, 496 U.S. 941, 110 S.Ct. 3225, 110 L.Ed.2d 671 (1990); *Minton v. St. Bernard Parish Sch. Bd.*, 803 F.2d 129, 132 (5th Cir.1986) (Louisiana) ("In view of the inherently local nature of the interests of Louisiana school boards, the wide degree of local autonomy they are granted under state law, and the predominately local source of their funding, it cannot be said either that these entities are mere arms of the state or that monetary judgments against them would represent indirect impositions on the state treasury interfering with the state's fiscal autonomy.[1] Louisiana school boards, therefore, are not entitled to eleventh amendment immunity to Section 1983 claims."); *Fay v. South Colonie Cent. Sch. Dist.*, 802 F.2d 21, 27 (2d Cir.1986) (New York) (stating that "being a steward of State education policy does not make the school district an alter ego of the state"), *overruled* on other grounds by *Taylor v. Vermont Dep't of Educ.*, 313 F.3d 768 (2d Cir.2002); *Unified Sch. Dist. No. 480 v. Epperson*, 583 F.2d 1118, 1123 (10th Cir.1978) (Kansas)(concluding that the local school district

"and its school board members acting in their official capacity, are not the alter ego of the state, but are more like a municipality . . . and hence do not enjoy Eleventh Amendment immunity."); *Adams v. Rankin County Bd. of Educ.*, 524 F.2d 928, 929 (5th Cir.1975) (per curiam) (Mississippi) (finding, under applicable Mississippi statutes, that "the Rankin County School system is a locally controlled institution which is supported largely by local revenues [1] and accordingly the Eleventh Amendment does not bar the award of back pay to those teachers who were reinstated since the suit is in reality not against the state itself but against what is primarily a local institution"), *cert. denied*, 438 U.S. 904, 98 S.Ct. 3121, 57 L.Ed.2d 1146 (1978); *Zahran v. New York Dep't of Educ.*, 306 F.Supp.2d 204, 208–09 (N.D.N.Y.2004) (concluding that board of education is not entitled to immunity under the Eleventh Amendment because it is not an arm of the state); *M.W. ex rel. T.W. v. Madison Co. Bd. of Educ.*, 262 F.Supp.2d 737, 743 (E.D.Ky.2003) (rejecting defendants' Eleventh Amendment argument because county board of education is a "political subdivision, and not an arm of the state"); *Swenson v. Lincoln County Sch. Dist. No. 2*, 260 F.Supp.2d 1136, 1138 n. 1 (D.Wyo.2003) (concluding that a school district is a political subdivision of the state, comparable to a city or county, and not entitled to Eleventh Amendment immunity); *School Bd. of the Parish of St. Charles v. Quala Sys., Inc.*, 159 F.Supp.2d 295, 297 (E.D.La.2001) (noting that Louisiana courts have " 'consistently held that school boards are autonomous political subdivisions and not the alter ego of the state from the standpoint of sovereign immunity' ") (citation omitted); *Lenzo v. School City of E. Chicago*, 140 F.Supp.2d 947, 962, (N.D.Ind.2001) (finding as a matter of law that School City of East Chicago is a political subdivision, not a state agency or instrumentality of the state; Eleventh Amendment immunity "does not shelter [it] from suit by a private litigant. . . . [T]he ADEA applies to the Defendant and governs its conduct."); *Gavigan v. Clarkstown Cent. Sch. Dist.*, 84 F.Supp.2d 540, 549 (S.D.N.Y.2000) (concluding that Eleventh Amendment does not protect the school district from suit).

Of course, while the federal decisions cited above are informative, we are not bound by them. Instead, we must adhere to the teachings of the Court of Appeals. Although the Board's termination of a media specialist for alleged insubordination appears to be quintessentially local in nature, appellant's contention that the Board is a local agency is at odds with numerous cases decided by the Court of Appeals; those decisions control our disposition. *See Livesay v. Baltimore County,* 384 Md. 1, 14–15, 862 A.2d 33, 40–41 (2004) ("The rule of *stare decisis* dictates the outcome of our decision today. *Stare* decisis, which means to stand by the thing decided, 'is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.' ") (quoting *Payne v. Tennessee,* 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)). Accordingly, we conclude that the Board is an arm of the State for purposes of a suit filed under federal and State law by a former Board employee, challenging his discharge based on claims of age discrimination.

## C. WAIVER OF SOVEREIGN IMMUNITY

Even if sovereign immunity might apply here, appellant argues that, by its conduct, the Board is barred from asserting sovereign immunity as a defense. Alternatively, Norville contends that the Legislature has waived sovereign immunity for certain claims against the Board, up to $100,000.

Preliminarily, we reject appellant's claim that, based on the representations of the Board's counsel, the Board has waived the defense of sovereign immunity. In *Charles E. Brohawn & Bros., Inc. v. Bd. of Trs. of Chesapeake Coll.,* 269 Md. 164, 304 A.2d 819 (1973), the Court of Appeals recognized that neither counsel for the State nor any of its agencies may, either by affirmative action or by failure to plead the defense, waive the defense of governmental immunity. Suits against the State can proceed only when the Legislature has authorized it and allocated funds for the satisfaction of the judgment.

*Id.* at 165–66, 304 A.2d 819; *see Sharafeldin, supra,* 382 Md. at 140, 854 A.2d 1208 ("State agencies may not, on their own, waive sovereign immunity 'either affirmatively or by failure to plead it' ") (Citation omitted); *Stern,* 380 Md. at 701, 846 A.2d 996; *Bd. of Trs. of Howard Cmty. Coll. v. John K. Ruff, Inc.,* 278 Md. 580, 583, 366 A.2d 360 (1976).

The State Board of Education is subject to the Maryland Tort Claims Act. S.G. § 12–104, titled "Waiver of immunity," provides.

(a) *In general.*—(1) Subject to the exclusions and limitations in this subtitle and notwithstanding any other provision of law, the immunity of the State and of its units is waived as to a tort action, in a court of the State, to the extent provided under paragraph (2) of this subsection.

(2) The liability of the State and its units may not exceed $200,000 to a single claimant for injuries arising from a single incident or occurrence.

\* \* \*

(2) Any payment of part of a settlement or judgment under this subsection does not abrogate the sovereign immunity of the State or any units beyond the waiver provided in subsections (a) and (b) of this section.

Title 12, Subtitle 3 of the State Government Article pertains to actions against State officers and State employees. S.G. § 12–301(3) expressly provides that the subtitle does *not* apply to "a county board of education." Moreover, as we noted earlier, Ed. § 4–105 provides:

(a) *Comprehensive liability insurance.*—Each county board shall carry comprehensive liability insurance to protect the board and its agents and employees. The purchase of this insurance is a valid educational expense.

(b) *Standards for policies; coverage.*—The State Board shall establish standards for these insurance policies, including a minimum liability coverage of not less than $100,000 for each occurrence. The policies purchased under this section shall meet these standards.

(c) *Self-insurance; minimum coverage.*—(1) A county board complies with this section if it:

(i) Is individually self-insured for at least $100,000 for each occurrence under the rules and regulations adopted by the State Insurance Commissioner. . . .

(2) A county board that elects to self-insure individually under this subsection periodically shall file with the State Insurance Commissioner, in writing, the terms and conditions of the self-insurance.

(3) The terms and conditions of this individual self-insurance:

(i) Are subject to the approval of the State Insurance Commissioner; and

(ii) Shall conform with the terms and conditions of comprehensive liability insurance policies available in the private market.

(Emphasis added).

In addition, Ed. § 4–105(d) provides that "[a] county board shall have the immunity from liability described under [C.J.] § 5–518. . . ." C.J. § 5–518(b), in turn, provides that "[a] county board of education . . . may raise the defense of sovereign immunity to any amount claimed above the limit of its insurance policy or, if self-insured . . . above $100,000." But, C.J. § 5–518(c) prohibits a county board of education from "rais[ing] the defense of sovereign immunity to *any claim* of $100,000 or less." (Emphasis added).

Under Article 49B, § 17A, the Board may not raise sovereign immunity as a defense in an employment discrimination case brought under § 16 of Article 49B. It provides:

**§ 17A. Sovereign immunity defense.**

This State, its officers, and its units may not raise sovereign immunity as a defense against a salary award in an employment discrimination case under § 16 of this article.

■ The question remains whether appellant's causes of action fall within the parameters of "any claim" in C.J. § 5–518(c). In our view, the plain language of the statute indicates

that the Board may not raise the defense of sovereign immunity in regard to *any claim* of $100,000 or less.

In *Alden, supra,* 527 U.S. at 712, 119 S.Ct. 2240, the Supreme Court determined that while FLSA purports to authorize private actions against states in their own courts, "powers delegated to Congress under Article 1 of the United States Constitution do not include the power to subject nonconsenting States to private suits for damages in state courts." Moreover, the *Alden* Court held that "the States retain immunity from private suit in their own courts, an immunity beyond the congressional power to abrogate by Article I legislation." *Id.* at 754, 119 S.Ct. 2240. On the other hand, the Court recognized that "sovereign immunity bars suits only in the absence of consent." *Id.* at 755, 119 S.Ct. 2240.

Similarly, in *Kimel, supra,* 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522, the Supreme Court made clear that a litigant cannot bring suit against a state, pursuant to the ADEA, in either federal or state court, unless the State has expressly waived its sovereign immunity with regard to the ADEA. It said: "The ADEA's purported abrogation of the States' sovereign immunity is accordingly invalid." *Id.* at 91, 120 S.Ct. 631.

In *Robinson v. Bunch,* 367 Md. 432, 788 A.2d 636 (2002), the Court of Appeals relied on *Alden* in deciding whether employees and a former employee of the Division of Parole and Probation (part of the Maryland Department of Public Safety and Correctional Services) had a viable claim against the Secretary of the Department for monetary damages based on allegations that they were not paid for overtime work, in violation, *inter alia,* of the federal Fair Labor Standards Act ("the FLSA"), 29 U.S.C. §§ 201 through 219. *Id.* at 434, 788 A.2d 636. The Secretary moved to dismiss the suit, claiming that, based on sovereign immunity, the federal causes of action were barred, and "that Congress had no authority to abrogate that immunity by authorizing suits of this nature against a state official in state courts." *Id.* at 436–37, 788 A.2d 636. The circuit court granted the motion to dismiss. This Court reversed, holding, *inter alia,* that the FLSA preempted the

Maryland statutory administrative and judicial remedy provided in Md. Code (1993, 1997 Repl. Vol.), § 12–402 of the State Personnel and Pensions Article ("SPP"). *See Bunch v. Robinson*, 122 Md.App. 437, 461–62, 712 A.2d 585 (1998).

The Court of Appeals granted *certiorari* to determine whether Congress had the power to abrogate a state's sovereign immunity with regard to suits under FLSA filed in state court. *Robinson, supra*, 367 Md. at 438, 788 A.2d 636 (citing to *Robinson v. Bunch*, 351 Md. 285, 718 A.2d 234 (1998)). However, the Court stayed the appeal pending the decision of the Supreme Court in *Alden, supra*, 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636. After the Supreme Court decided *Alden*, the Secretary moved to reverse this Court's decision. *Robinson, supra*, 367 Md. at 438, 788 A.2d 636. Instead, the Court amended its *certiorari* order. It said, *id.* at 434, 788 A.2d 636:

> [T]he dispositive issues are whether Maryland law provides a remedy or remedies for adjudication of the plaintiffs' claims and, if so, whether the present action was an authorized remedy. We shall hold that Maryland law does provide a statutory administrative and judicial review remedy for adjudication of the plaintiffs' claims and that the remedy is exclusive. We shall further hold that, because the present lawsuit is not encompassed by the exclusive statutory administrative and judicial review remedy, the Circuit Court correctly dismissed the action.

According to the Court, "[t]he *Alden* case made it clear that the FLSA could not constitutionally authorize an action such as the one here involved. At the same time, however, the Supreme Court made it clear in *Alden* that *state law* could authorize such actions." *Id.* at 439, 788 A.2d 636 (internal citation omitted). The Court assumed that the overtime provisions of FLSA were applicable to the employees, and proceeded to consider whether any State law gave them a remedy for the alleged violations of FLSA and State law. *Id.* at 442–43, 788 A.2d 636.

The Court examined SPP § 8–302, which provides that State employees are eligible for overtime compensation provided in that subtitle or, to the extent applicable, as required by the FLSA. The Court also considered Subtitle 14 of SPP, which waives the State's sovereign immunity for claims filed pursuant to SPP § 8–302. *Id.* at 442–43, 788 A.2d 636. The Court of Appeals held, however, that the State did not waive sovereign immunity with respect to direct judicial actions against the State under the FSLA. *Id.* at 446, 788 A.2d 636. Rather, the employees had to pursue their claims through administrative grievance procedures, which constituted their exclusive remedy. The Court explained, *id.* at 439, 788 A.2d 636:

> [I]t is clear that the Supreme Court's decision in *Alden v. Maine, supra,* 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636, requires that we overrule the Court of Special Appeals' holding that the plaintiffs are entitled to maintain this action under remedial provisions of the FLSA invoked by the plaintiffs. The *Alden* case made it clear that the FLSA could not constitutionally authorize an action such as the one here involved. At the same time, however, the Supreme Court made it clear in *Alden,* 527 U.S. at 755, 119 S.Ct. at 2267, 144 L.Ed.2d at 678–79, that *state law* could authorize such actions.

The Court said, *id.* at 443, 788 A.2d 636:

> The above-reviewed statutory provisions make it clear that covered state employees are entitled to overtime compensation in accordance with applicable state law or the FLSA, whichever is greater, that there is a duty on the part of the State or the appropriate officials to make such payments or provide for them through the budget process, and that sovereign immunity is not a defense.

The Court observed that, "if the General Assembly had not enacted a specific statutory remedy, state employees would certainly have a common law remedy in Maryland courts to enforce their rights to mandated overtime compensation under state or federal law." *Id.* at 444, 788 A.2d 636. Specifically,

" 'Article 19 [of the Maryland Declaration of Rights] insures that rights belonging to Marylanders are "not illegally or arbitrarily denied by the government." ' " *Id.* (citations omitted). Nevertheless, the Court recognized that the Legislature "established a statutory administrative and judicial review remedy for state employees who claim that they have not been compensated in accordance with applicable legal requirements." *Id.* at 445, 788 A.2d 636. In the Court's view, "[t]he language of [S.P.P.] § 12–103 evidences the General Assembly's intent that the administrative and judicial review grievance procedure constitutes the exclusive remedy for claims such as those made by the plaintiffs-respondents in this case." *Id.* at 446, 788 A.2d 636. Therefore, it concluded that "the Legislature intended to preclude direct judicial actions such as the present one." *Id. See also Md. Military Dep't.,* 382 Md. at 128–29, 854 A.2d 1200; *Utilities v. WSSC,* 362 Md. 37, 45, 763 A.2d 129 (2000).

To be sure, "[t]he doctrine of sovereign immunity ... precludes such a damages action [for wrongful discharge] against the 'State of Maryland' absent legislation consenting to suit." *Ritchie v. Donnelly,* 324 Md. 344, 369, 597 A.2d 432 (1991). Moreover, " '[a] waiver of sovereign immunity is to be strictly construed, in terms of its scope, in favor of the sovereign.' " *Lizzi v. WMATA,* 156 Md.App. 1, 9, 845 A.2d 60 (2003) (quoting *Dep't. of the Army v. Blue Fox Inc.,* 525 U.S. 255, 261, 119 S.Ct. 687, 142 L.Ed.2d 718 (1999)), *cert. granted,* 381 Md. 674, 851 A.2d 593 (2004). " 'Such a waiver must also be "unequivocally expressed" in the statutory text.' " *Lizzi,* 156 Md.App. at 10, 845 A.2d 60 (citation omitted).

Based on the foregoing, we must construe the statutory text (i.e., boards of education "may not raise the defense of sovereign immunity to *any claim* of $100,000 or less"), to determine the scope of any waiver of immunity. To do so, we rely on well settled principles of statutory construction.

The interpretation of a statute is a judicial function. *Muhl v. Magan,* 313 Md. 462, 481–82, 545 A.2d 1321 (1988). Our goal is to "ascertain and effectuate legislative

intent." *Consolidated Constr. Servs., Inc. v. Simpson,* 372 Md. 434, 456, 813 A.2d 260 (2002); *see Moore v. Miley,* 372 Md. 663, 677, 814 A.2d 557 (2003); *Liverpool v. Balt. Diamond Exch., Inc.,* 369 Md. 304, 316, 799 A.2d 1264 (2002); *Mayor & City Council of Balt. v. Chase,* 360 Md. 121, 128, 756 A.2d 987 (2000). "The legislative intent can be divined through an analysis of the plain language of the statute itself and from consideration of the statutory scheme as a whole." *Moore,* 372 Md. at 677, 814 A.2d 557.

We construe the words of a statute "according to their common and everyday meaning." *Id.* (citation and quotation marks omitted). When the words are "clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written." *Id.* (citation and quotation marks omitted). Moreover, we may not "modify an unambiguous statute by adding or removing words to give it a meaning not reflected by the words the Legislature chose to use, nor 'engage in forced or subtle interpretation in an attempt to extend or limit the statute's meaning.'" *Facon v. State,* 375 Md. 435, 446, 825 A.2d 1096 (2003) (citation omitted); *see also Harris v. Bd. of Educ. of Howard County,* 375 Md. 21, 31, 825 A.2d 365 (2003); *Clarence W. Gosnell, Inc. v. Hensley,* 156 Md.App. 224, 236, 846 A.2d 469 (2004).

To the extent "reasonably possible," we read a statute so "that no word, phrase, clause or sentence is rendered surplusage or meaningless." *Mazor v. State of Md., Dep't of Corr.,* 279 Md. 355, 360, 369 A.2d 82 (1977); *see Eng'g Mgmt. Servs., Inc. v. Md. State Highway Admin.,* 375 Md. 211, 224, 825 A.2d 966 (2003); *Motor Vehicle Admin. v. Lytle,* 374 Md. 37, 61–2, 821 A.2d 62 (2003). To effectuate the legislative intent, we may also consider "'the consequences resulting from one meaning rather than another, and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense.'" *Chesapeake Charter, Inc., supra,* 358 Md. at 135, 747 A.2d 625 (citation omitted). But, "absurd results" in the interpretation of a statute "are to be shunned." *Mayor & Council of*

*Rockville v. Rylyns Enterprises, Inc.*, 372 Md. 514, 550, 814 A.2d 469 (2002).

▉▉▉ When we are unable to determine the Legislature's intent from the statutory text, we may search for other *indicia* of intent. *Baltimore County v. RTKL Assocs.*, 380 Md. 670, 678, 846 A.2d 433 (2004). For example, we may look to legislative history, the statutory purpose, and the "relative rationality and legal effect of various competing constructions." *Id.* at 678, 846 A.2d 433; *see Sharafeldin, supra*, 382 Md. at 138, 854 A.2d 1208.

With this understanding of the principles of statutory construction, we turn to consider the parties' contentions. Under the settled approach to statutory interpretation, the words "any claim" cannot reasonably be read to exclude certain categories of claims. The plain and unambiguous meaning of the statutory text is that the Board cannot assert sovereign immunity as a defense to "any" claim under $100,000, including those based on age discrimination.

In this case, the circuit court found that Maryland has "partially waived the sovereign immunity of the county boards of education." Yet, it also concluded that it did not waive "constitutional immunity to suit under the ADEA." Accordingly, the court held that "a private plaintiff cannot bring a cause of action based on the ADEA against a County board of education in a Maryland state court." In adopting this view, we believe that the trial court erred. We agree with Norville that the trial court's interpretation of C.J. § 5–518 conflicts with the plain meaning of the statute.[17] Therefore, we shall remand appellants' ADEA claim for further proceedings.

### D. *Article 49B*

▉▉▉ Next, we must determine whether appellant has a private right of action under the Fair Employment Practices Act, codified in Article 49B of the Maryland Code. The Act

---

17. Our resolution of this issue makes it unnecessary to address Norville's claim under Article 19.

prohibits termination of employment for discriminatory reasons. Section 14 of the Act articulates the State's policy as to discrimination. It states:

### § 14. Declaration of policy.

It is hereby declared to be the policy of the State of Maryland, in the exercise of its police power for the protection of the public safety, public health and general welfare, for the maintenance of business and good government and for the promotion of the State's trade, commerce and manufacturers to assure all persons equal opportunity in receiving employment and in all labor management-union relations regardless of race, color, religion, ancestry or national origin, sex, age, marital status, sexual orientation, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment, and to that end to prohibit discrimination in employment by any person, group, labor organization, organization or any employer or his agents.

Article 49B includes a specific procedure and remedy for the redress of any alleged wrongs. *See Parlato v. Abbott Labs.*, 850 F.2d 203, 205 (4th Cir.1988). The statute authorizes the MCHR to initiate litigation. Specifically, sections 11 and 12 of Article 49B describe the procedure and relief available to a litigant under Article 49B. Section 12 states, in part:

### § 12. Enforcement of Commission's orders; complaint maliciously made; right to bring civil action not denied.

(a) If any respondent refuses to comply with an order of the Commission made within the scope of any of these subtitles, *the Commission may, represented by its general counsel, institute litigation in the appropriate equity court of the county or in Baltimore City where the alleged discrimination took place to enforce compliance with any of the provisions of this article.*

The court, in hearing said case, shall be governed by the judicial review standards as set forth in the Administrative

Procedure Act, Title 10, Subtitle 2 of the State Government Article of the Annotated Code of Maryland. . . .

(Emphasis added).

Section 16 of the Act makes it unlawful for an employer to discriminate based on age and other criteria. It states, in part:

### § 16. Unlawful employment practices.

(a) *Failure to hire or discharge; reduced status.—It shall be an unlawful employment practice for an employer:*

(1) To fail or refuse to hire or *to discharge any individual,* or otherwise to discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment, *because of such individual's* race, color, religion, sex, *age,* national origin, marital status, sexual orientation, genetic information, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment, or because of the individual's refusal to submit to a genetic test or make available the results of a genetic test; . . . .

(Emphasis added).

In Article 49B, § 16 the Legislature authorizes the MCHR to provide an avenue of relief to aggrieved persons. As the Court of Appeals said in *Makovi v. Sherwin–Williams Co.,* 316 Md. 603, 607–08, 561 A.2d 179 (1989):

Like its federal counterpart, the original version of the Maryland statute declared discriminatory employment practices to be unlawful. *See* Art. 49B, § 16. It provided for limited enforcement through an administrative agency, now the Human Relations Commission (HRC) (then entitled "Interracial Commission"). In 1965 enforcement of Art. 49B did not include any monetary relief. *See Gutwein v. Easton Publishing Co.,* 272 Md. 563, 325 A.2d 740 (1974), *cert. denied,* 420 U.S. 991, 95 S.Ct. 1427, 43 L.Ed.2d 673 (1975). Power to award back pay of up to two years in connection with an order of reinstatement or hiring was conferred on the HRC by Ch. 937 of the Acts of 1977. *See* Art. 49B, § 11(e).

We are satisfied, however, that Article 49B does not provide a private right of action under the circumstances attendant here. *See Md.–Nat'l Capital Park & Planning Comm'n v. Crawford,* 307 Md. 1, 25 n. 10, 511 A.2d 1079 (1986); *Dillon v. Great Atl. & Pac. Tea Co. Inc.,* 43 Md.App. 161, 403 A.2d 406 (1979). We explain.

In *Tierco Maryland, Inc. v. Williams,* 381 Md. 378, 403–04 n. 22, 849 A.2d 504 (2004), the Court recognized that the "viability" of a private cause of action for discrimination "may find some support by analogy in *Molesworth v. Brandon,* 341 Md. 621, 637, 672 A.2d 608, 616 (1996)." In *Molesworth,* a female veterinarian brought a common law wrongful discharge claim based on an allegation of sex discrimination. *Molesworth,* 341 Md. at 626, 672 A.2d 608. She could not proceed under the Act, however, because her employer had fewer than fifteen employees, and the statute expressly excludes from coverage any employer who has less than fifteen employees. *Id.* at 628, 672 A.2d 608. Nevertheless, the Court recognized that "Art. 49B, § 14 provides a clear statement of public policy sufficient to support a common law cause of action for wrongful discharge against an employer exempted by Art. 49B, § 15(b)." *Id.* at 637, 672 A.2d 608.

Here, the Board, as the employer, has more than fifteen employees. Therefore, the rationale of *Molesworth,* permitting a private common law cause of action for wrongful discharge, does not apply. *See Makovi, supra,* 316 Md. at 608, 561 A.2d 179; *Jordan v. CSX Int'l, Inc.,* 991 F.Supp. 754, 756 n. 1 (D.Md.1998)(recognizing that Art. 49B "empower[s] only the [MHRC] to initiate litigation upon an employer's refusal to comply with the Commission's orders.... The statute does not create a private cause of action"); *Malina v. Balt. Gas & Electric Co.,* 18 F.Supp.2d 596, 611 (D.Md.1998)(Art. 49B "does not create a private cause of action"). Instead, Article 49B confers on the MCHR the authority to pursue such claims.

*Porterfield v. Mascari II, Inc.,* 374 Md. 402, 426–27, 823 A.2d 590 (2003), elucidates the point. There, the Court of Appeals explained:

When there is no remedy provided by a statute ... the absence of the remedy may justify vindication for violation of the public policy through a [common law] wrongful discharge action. In *Molesworth v. Brandon,* 341 Md. 621, 628, 672 A.2d 608, 612 (1996), we considered the provisions of the Maryland Fair Employment Practices Act ("FEPA") and held that Md. Code (1957, 1986 Repl. Vol.), Art. 49B, § 14 provided a sufficiently clear statement of public policy with respect to *all* employers who discriminate based on sex, despite explicit limitations on the scope of coverage of the statute. That employers of less than fifteen employees were exempted specifically from the administrative adjudicatory *process* outlined in FEPA for allegations of misconduct did not mean that such employers were exempted from the *policies* established by the Act for purposes of the wrongful discharge tort. *Id.* We therefore held that Art. 49B, § 14 provided a clear statement of public policy sufficient to support a common law cause of action for wrongful discharge against an employer otherwise excluded from the reach of FEPA's administrative process. 341 Md. at 637, 672 A.2d at 616.

Accordingly, to assert a claim under Art. 49B, appellant had to proceed by way of the MCHR. Appellant exhausted his administrative remedies with the EEOC/MCHR and filed his complaint in the federal district court, pursuant to EEOC's advisement in its "right to sue" letter. However, appellant has no private right of action under Article 49B. Therefore, the court did not err in dismissing that claim.

### E. WRONGFUL DISCHARGE

 Appellant contends: "At the very least, if Norville's injury cannot be vindicated by the ADEA remedies because of sovereign immunity, or by the 49B remedies because there is no private cause of action, Norville should be allowed to proceed with a common law wrongful discharge remedy. Otherwise, his Article 19 guarantee to a remedy would be nullified." In response, the Board maintains that appellant's claim for wrongful discharge was properly dismissed because of the

availability of both federal and State statutory remedies, which preempt any common law claims of wrongful discharge.

In Maryland, with few exceptions, at-will employment has been held to be terminable by either party at any time for any reason whatsoever. *Adler v. American Standard Corp.*, 291 Md. 31, 35, 432 A.2d 464 (1981) (citing *St. Comm'n on Human Rel. v. Amecom Div.*, 278 Md. 120, 360 A.2d 1 (1976), *Vincent v. Palmer*, 179 Md. 365, 19 A.2d 183 (1941), and *Washington, Baltimore & Annapolis R.R. Co. v. Moss*, 127 Md. 12, 96 A. 273 (1915)). Although the common law at-will rule has not been abrogated, statutory exceptions have been "engrafted" that limit the previously unfettered discretion to discharge at-will employees. *Adler*, 291 Md. at 35, 432 A.2d 464; Gil A. Abramson & Stephen M. Silvestri, *Recognition of a Cause of Action for Abusive Discharge in Maryland*, 10 U. BALT. L. REV. 257, 259–62 (1981).

In *Adler, supra*, 291 Md. 31, 432 A.2d 464, the Court of Appeals recognized the common law tort of wrongful discharge, constituting in this State the first judicially created exception to the at-will doctrine. *Id.* at 47, 432 A.2d 464. The Court reviewed the evolving case law from other jurisdictions, noting that the overwhelming majority that adopted the cause of action defined it as a tort in which the employee may recover damages arising from the employee's discharge under circumstances violating a clear mandate of public policy. *Id.* at 35–41, 432 A.2d 464. The "public policy" could derive from statute, judicial decision, administrative regulation, or from any other appropriate source. *Id.* at 45, 432 A.2d 464. In deciding whether a policy will support a cause of action, however, the touchstone must be clarity. *Id.* at 42–43, 432 A.2d 464. The Court determined that the public policy in question was not sufficiently clear to support the particular claim at issue. *Id.* at 43–47, 432 A.2d 464.

In the wake of *Adler*, the focus of many wrongful discharge cases has been the clarity of the public policy at issue. For example, in *Kern v. S. Balt. Gen. Hosp.*, 66 Md.App. 441, 504 A.2d 1154 (1986), an employee discharged for absenteeism due

to a work-related injury alleged that the statutory policy underlying the Workman's Compensation Act applied to her discharge. This Court reviewed the statutory policy, which expressly precludes discharge "solely" because the employee has filed a claim under the Workman's Compensation Act. *Id.* at 446–47, 504 A.2d 1154 (citing Art. 101, § 39A (1985)). From the language of the statute, we concluded that the policy did not contain a sufficiently clear mandate regarding discharges that were not "solely" due to a filed claim. *Id.*

In this case, the circuit court found *Makovi, supra,* 316 Md. at 603, 561 A.2d 179, instructive in its analysis of appellant's wrongful discharge claim. In that case, the plaintiff filed a complaint with the EEOC alleging sex discrimination. *Id.* at 605, 561 A.2d 179. But, the EEOC did not find reasonable cause for the claim and notified the complainant of her right to file suit under Title VII. *Id.* Instead, the complainant chose to file a wrongful discharge claim in circuit court against her employer, a corporation not statutorily exempt, claiming sex discrimination based on her discharge from employment during pregnancy. *Id.*

The Court of Appeals limited the availability of the common law wrongful discharge action. It held that a claim of common law wrongful discharge, by its nature as a purely supplemental remedy, was not available to the plaintiff, because the Act set forth its own remedy. *Id.* at 609, 561 A.2d 179. Essentially, the Court concluded that, as the tort is supplementary and not complementary, it is only available where it provides relief that does not overlap an already extant remedy; only where a clear mandate of public policy would otherwise be left unvindicated is the common law tort available. *Id.* at 611–12, 561 A.2d 179.

Observing that Art. 49B authorized individuals to file complaints with the Maryland Commission on Human Relations (the "HRC"), and empowered the HRC to investigate and remedy acts of employment discrimination, the Court declined to extend the common law tort of wrongful discharge to discriminatory employment practices covered by the enforce-

ment mechanisms in the Act. *Id.* at 621–26, 561 A.2d 179. *See generally* Comment, *Torts—Wrongful Discharge—Maryland Limits The Scope Of The Wrongful Discharge Tort Where Statutory Civil Remedies Are Available,* 20 U. BALT. L. REV. 290 (1990). The Court said, *id.* at 626, 561 A.2d 179:

> In cases of discharge motivated by employment discrimination prohibited by Title VII and Art. 49B the statutes create both the right, by way of an exception to the terminable at-will doctrine, and remedies for enforcing that exception. Thus, the generally accepted reason for recognizing the tort, that of vindicating an otherwise civilly unremedied public policy violation, does not apply. Further, allowing full tort damages to be claimed in the name of vindicating the statutory public policy goals upsets the balance between right and remedy struck by the Legislature in establishing the very policy relied upon.

Here, the Board is within the purview of the Act. And, appellant was provided with an administrative remedy by way of Article 49B. Because appellant had a statutory remedy available to him, he cannot pursue a common law wrongful discharge claim. *Compare Molesworth, supra,* 341 Md. at 637, 672 A.2d 608 (recognizing common law claim for wrongful discharge based on sex discrimination because, due to size of employer, Art. 49B did not apply). Accordingly, we shall affirm the circuit court's dismissal of appellant's common law wrongful discharge claim.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED FOR FURTHER PROCEEDINGS; COSTS TO BE PAID 50% BY APPELLANT, 50% BY THE ANNE ARUNDEL COUNTY BOARD OF EDUCATION.**